IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

C. H.,                                        :
                                              :
                    Plaintiff,                :
                                              :
        v.                                    : C. A. No. 07-cv-00193-MPT
                                              :
                                              :
THE CAPE HENLOPEN SCHOOL                      :
DISTRICT, et al.,                             :
                                              :
                    Defendants.               :

PLAINTIFF'S OPENING BRIEF IN SUPPORT
OF HIS MOTION FOR SUMMARY JUDGMENT

Bruce L. Hudson, Esq.,
Delaware Bar No. 1003
800 N. King Street, Suite 302
Wilmington, DE 19801
(302) 656-9850

Wayne D. Steedman,
Federal Bar No. 09474
Callegary & Steedman, P.A.
201 N. Charles Street, Suite 1402
Baltimore, Maryland 21201
410-576-7606

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS............................................................1

SUMMARY OF THE ARGUMENT...............................................................................1

STATEMENT OF FACTS..............................................................................................3

      THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA)..........7

STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE
DISPUTE.....................................................................................................................8

ARGUMENT................................................................................................................11

      I. **Standard of Review For Summary Judgment**.............................................11

      II. **Standard of Review For Hearing Panel's Decision and Order**..................11

      III. **The Hearing Panel Erroneously Concluded That There Was No Need For
an IEP To Be In Place At the Beginning Of The School Year**........................12

            A. **The Panel Erroneously Analogized C.H.'s Situation to an Out-Of-
State Transfer**........................................................................................12

            B. **The Panel Erred in Finding That the District Was Not Consistently
Responsible for C.H.'s Education**..........................................................15

            C. **The Panel Erred in Holding That C.H. Was Required to Re-enroll
in The District Before the District Became Responsible For His
Education**................................................................................................15

      IV. **The Hearing Panel Erroneously Concluded That the District Did Not
Commit a Procedural Violation By Failing to Issue a Notice for a September
11, 2006 IEP Meeting**........................................................................................18

      V. **The District's Procedural Violations Constituted a Denial of FAPE**.........21

      VI. **The Parents Are Entitled to Be Reimbursed For the Costs of The Gow
School**................................................................................................................24

CONCLUSION.............................................................................................................24

# TABLE OF AUTHORITIES

## Cases

Bd. of Educ. Hendrick Hudson Cent. Sch. Dist. v. Rowley,
458 U.S. 176 (1982)............................................................................................passim

Sch. Comm. of Burlington v. Dept. of Educ.,
471 U.S. 359 (1985)........................................................................................24

Honig v. Doe,
484 U.S. 306 (1988)........................................................................................7, 21

Shore Reg'l High Sch. Bd. of Educ. v. P.S.,
381 F.3d 194 (3d Cir. 2004).............................................................................12

S.H. v. State-Operated Sch. Dist. of the City of Newark,
336 F.3d 260 (3d Cir. 2003)..........................................................................11, 12

Gadsby By Gadsby v. Grasmick,
109 F.3d 940 (4th Cir. 1997)..........................................................................7, 21

E.H. v. Tirozzi,
779 F.Supp. 53 (D. Conn. 1990).........................................................................7

Fisher v. Bd. of Educ. of the Christina Sch. Dist.,
856 A.2d 552 (Del. 2004)..............................................................................11, 12

## Statutes

Individuals with Disabilities Education Act,
20 U.S.C. § 1400 *et seq.*..................................................................................1

20 U.S.C. § 1400..............................................................................................7

20 U.S.C. § 1401..............................................................................................3

20 U.S.C. § 1412............................................................................................24

20 U.S.C. § 1414.......................................................................................7, 8, 13

20 U.S.C. § 1415..............................................................................................8

29 U.S.C. § 705................................................................................................3

Fed. R. Civ. P. 56(c).........................................................................................11

34 C.F.R. § 300.33...........................................................................................16

34 C.F.R. § 300.300.........................................................................................16

34 C.F.R. § 300.321...........................................................................................7

34 C.F.R. § 300.322.........................................................................................18

34 C.F.R. § 300.323......................................................................................12, 14

34 C.F.R. § 300.513...........................................................................................21

14 Del. C. § 202.................................................................................13, 14, 15

14 Del. Adm. C. § 925.22..................................................................................18

14 Del. Adm. C. § 925.22.1.1.......................................................................18, 20

14 Del. Adm. C. § 925.22.1.2.............................................................................19

14 Del. Adm. C. § 925.22.2.1.............................................................................19

14 Del. Adm. C. § 925.22.3...............................................................................19

14 Del. Adm. C. § 925.22.4...............................................................................19

14 Del. Adm. C. § 925.23.2...............................................................................20

14 Del. Adm. C. § 925.23.4...............................................................................14

14 Del. Adm. C. § 925.23.5...............................................................................14

14 Del. Adm. C. § 926.3.2.................................................................................21

## Other Authorities

Cape Henlopen Sch. Dist.,
24 IDELR 1087 (1996)...............................................................................22, 23

In Re: Student with a Disability,
27 IDELR 1170 (1998)......................................................................................23

## NATURE AND STAGE OF THE PROCEEDINGS

On September 7, 2006, the Plaintiff requested an administrative due process hearing alleging that the Cape Henlopen School District (hereinafter, "the District") and the Delaware Department of Education (hereinafter, "the Department") had violated the Individuals with Disabilities Education Act (hereinafter "IDEA"), 20 U.S.C. § 1400 *et seq*. Specifically, the Plaintiff alleged that the District had failed to timely develop and Individualized Eduation Plan (hereinafter, "IEP") for student C.H.; that the District had failed to provide IEP services in a timely manner, and in compliance with regulations under the IDEA; that the District failed to timely provide the Plaintiff with required notice of a meeting to develop an IEP for C.H.; that the District failed to timely evaluate C.H. for necessary speech and language services; and that the District failed to timely review and consider relevant information in developing an evaluation of C.H. On January 6, 2007, the administrative due process hearing panel (hereinafter, "the Panel") issued its Hearing Order and Decision rejecting four of the Plaintiff's five claims, finding only that the District's notice for an IEP meeting did not provide sufficient information as to content of the meeting. *In the Matter of CH*, DE DP 07-06. On April 5, 2007, the Plaintiff filed a Complaint for Declaratory and Injunctive Relief (hereinafter "the Complaint") appealing that decision in this Court. Defendants filed an Answer to the Complaint on June 14, 2007. Discovery closed on October 30, 2007. This is the Plaintiff's Opening Brief in support of his Motion for Summary Judgment.

## SUMMARY OF THE ARGUMENT

The Plaintiff is entitled to judgment as a matter of law on all of the claims raised in his complaint:

(1)     The Panel erred in finding that the District had no obligation to have developed an Individualized Education Plan (hereinafter, "IEP") for C.H. by the first day of the 2006-2007 school year.  In the process of reaching that conclusion, the Panel committed a legal error when it erroneously analogized C.H. to a student transferring into the District for the first time, that the District did not have a continuous responsibility to provide C.H. a "free appropriate public education" (FAPE), and that the District had no obligation to educate C.H. until his parents re-enrolled him into the District.

(2)     The Panel erred in finding that the District was not required to provide notice to C.H.'s parents that an IEP meeting would occur on September 11, 2006.  In the process of reaching that conclusion, the Panel erroneously found that neither federal nor state laws require the District to issue more than one meeting notice, as long as the District "continues" the IEP development process at the end of the noticed meeting.

(3)     The procedural violations of IDEA and state regulations committed by the District deprived C.H. of educational benefits and impeded the opportunity of C.H.'s parents to participate which constituted a denial of the provision of a FAPE to C.H.

(4)     The District's failure to offer C.H. a FAPE forced the parents to place C.H. back at the Gow School for the 2006-2007 school year.  Gow provided and continues to provide an appropriate education to C.H.  Therefore the parents are entitled to be reimbursed for all expenses related to C.H.'s placement at Gow for the 2006-2007 school year and continuing until the District offers C.H. a FAPE.

Therefore, the Plaintiff is entitled to judgment as a matter of law.

## STATEMENT OF FACTS

C.H. is a minor child, born November 11, 1990.  He has been diagnosed with Dyslexia, Dysgraphia and a Severe Language Disorder.  Since the 1998-1999 school year he has been identified as a child with a specific learning disability, within the definition of that term in 20 U.S.C. § 1401 and 29 U.S.C. § 705.  C.H. moved with his family into the District in 2000, and they have remained residents of the District for all relevant times thereafter.

He was first enrolled in the District's schools in 2000, and attended fourth grade in the District during the 2000-2001 school year.  His parents and the District repeatedly disagreed with whether and how the District was providing FAPE, and C.H.'s mother and father requested and conducted Due Process Hearings in 2001 and 2002.  In January 2002, when C.H. was in the fifth grade, his parents unilaterally placed him at the Greenwood School, a private school in Vermont, and sought reimbursement from the District.  A Due Process Hearing Panel denied the Parents' request for reimbursement.

C.H. returned to seventh grade in the District in fall 2003.  The Parents and the District engaged in the IEP process, and agreed on an IEP for C.H.  However, the parents and the District were unable to agree on placement for C.H. within the District.  In February 2004, when C.H. was in the seventh grade, his parents unilaterally placed him at the Gow School, a private residential school in South Wales, New York, specializing in education for boys with dyslexia and language-based learning disorders.

On June 9, 2005, the District offered a placement to C.H.   C.H.'s parents rejected that placement and requested a due process hearing to request reimbursement for C.H.'s private placement.  The District filed a counter-complaint.  On September 2, 2005,

parents and the District entered into a settlement agreement.  The settlement agreement resolved all disputes arising from the District's obligation to provide FAPE and appropriate placement for C.H. for the 2005-2006 school year.   Pursuant to the settlement, the District funded C.H.'s private placement at the Gow School for the 2005-2006 school year.  See Exhibit 6 (hereinafter "Ex. 6") at 3: ¶ 1.[1]   In return, the parents agreed to release to the District reports and records of C.H.'s performance at the Gow School.  See id. at 3: ¶ 4.  Finally, the parents agreed as a condition of the settlement that the District, and not the Gow School, would be C.H.'s "stay-put" placement in the event that the parents filed another due process request during the 2005-2006 school year.[2]  See id. at 3: ¶ 18.

　　　　C.H. attended the Gow School for ninth grade during the 2005-2006 school year. Over the course of that school year, the District's Supervisor of Special Programs (hereinafter, "the Supervisor") and C.H.'s mother met and discussed possible placement for C.H. for the 2006-2007 school year.  See Exhibit 2 (hereinafter "Ex. 2") at 138: 3-14. The supervisor and parent met repeatedly over the course of the 2005-2006 school year. See id. at 140: 2-9.  C.H.'s parent and the District employee had discussed scheduling evaluations for C.H. as early as December 2005.  See Exhibit 3 (hereinafter "Ex. 3") at 47: 7-19.  The Supervisor had access to C.H.'s during vacation periods from his private placement, when he was in the District and available for evaluation.  See Ex. 2 at 141: 9-12.

---

[1] For the convenience of the Court, and because the Administrative Record is tabbed and not consecutively paginated, citations to that record in this Memorandum will take the format of "Exhibit [Tab Number] at [page number]."  Exhibit 6 contains the entirety of Parent's Exhibits admitted into evidence by the Hearing Panel; therefore, citations to one of Parent's Exhibits will be formatted as "Exhibit 6 at [Exhibit Number]: [page or paragraph number]" as necessary.  The Plaintiff apologizes for any inconvenience.

[2] Stay-put refers to the IDEA's requirement that during the pendency of any administrative or judicial proceedings conducted pursuant to a due process complaint, the child remains in his current educational placement. 34 C.F.R. § 300.518(a).

Nevertheless, the District did not initiate the IEP development process until May 30, 2006, when the Supervisor sent a letter seeking the parents' permission to evaluate C.H. See Ex. 6 at 6.[3] On June 9, 2006, the parent returned a signed form and attached a letter requesting that the District consider the qualifications of prospective evaluators, and use only experts in the relevant disorders. See id. at 6.[4] Following parent's return of the form and accompanying letter, the District took no action to evaluate C.H. or contact parent until July, 2006. See Ex. 6 at 7. During that period, the person employed as Supervisor took a new job with the District. See Ex. 2 at 89: 18 (noting that Elizabeth Joynes was employed as Supervisor until "June 2006"). She continued, however, to "juggle[] both positions." See id. at 91: 16-18. The Supervisor admitted that, in her two roles, "there was a lot going on," and some preparations for the IEP meeting "slipped her mind." Ex. 2 at 114: 16-20

On July 5, 2006, the outgoing Supervisor sent a letter stating that it was unclear whether parent had actually given permission to evaluate C.H. because the form lacked a checkmark. See Ex. 6 at 7.[5] Parent returned the form, with a checkmark, on July 6, 2006. See Ex. 6 at 7.[6] A District psychologist evaluated C.H. on August 7 and August 14, 2006, and completed a report of his evaluation on August 15, 2006. See Ex. 6 at 19. On August 18, 2006, the District sent an IEP meeting notice to parent scheduling an IEP team meeting for August 22, 2006. See Ex. 6 at 10.[7] Notice for the meeting stated that the purpose of the meeting was to review the results of recent evaluations, determine eligibility for special education services and to develop review or revise an IEP. See id.

---

[3] For the convenience of the Court, the citation here refers to the unnumbered first page of Ex. 6 at 6.
[4] For the convenience of the Court, the citation here refers to the unnumbered second page of Ex. 6 at 6.
[5] For the convenience of the Court, the citation here refers to the unnumbered first page of Ex. 6 at 7.
[6] For the convenience of the Court, the citation here refers to the unnumbered second page of Ex. 6 at 7.
[7] For the convenience of the Court, the citation here refers to the unnumbered fourth page of Ex. 6 at 10.

The IEP meeting convened on August 22. Over the course of the meeting, the psychologist reviewed the contents of his report, and the team found that C.H. remained eligible for special education. <u>See</u> Ex. 6 at 18: 1-2. The team did not develop an IEP for C.H.'s tenth grade year during the meeting. Meeting minutes do not reflect a date for a subsequent meeting to develop an IEP for C.H. <u>See</u> <u>id</u>.

A new Supervisor of Special Programs began working for the District on Friday, September 1, 2006. <u>See</u> Exhibit 1 at 48: 17-18. The first day of school in the District was September 5, 2006. <u>See</u> <u>id</u>. at 48: 21-49: 1. No meeting to develop or revise an IEP for C.H. had taken place by that day, nor had parent received notice of such a meeting. The parents never received a written notice for a second IEP meeting. The District convened a meeting on September 11, 2006, without parents in attendance.

Not having a school program or placement identified nor an IEP ready at the beginning of the school year, the Parents unilaterally placed C.H. at the Gow School for the 2006-2007 school year. On September 7, 2006, the parents filed a due process hearing request on behalf of C.H., alleging that the District had committed procedural errors in the process of developing an IEP for C.H. The Parents alleged that those errors rose to the level of denial of FAPE, and as a remedy requested that the District pay full tuition and costs for C.H. to attend the Gow School for the 2006-2007 school year. The Department was added as a party on motion of the District, because the requested relief included reimbursement for an out-of-state private program.

A due process hearing was convened on December 4 and 12, 2006. On December 22, 2006, both parent and the District filed closing arguments. The panel issued its decision on January 6, 2007, finding in favor of the District on all but one of the parent's

claims. The Panel found in parent's favor that the (uncomplained-of) notice for the

August 22 IEP meeting should have contained notice that the meeting would consider

transition services for C.H.

<u>THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA)</u>

The IDEA represents an ambitious federal effort to ensure that children with

disabilities receive a "free and appropriate public education" (FAPE). <u>See</u> 20 U.S.C. §

1400(d); <u>see also</u> <u>Bd. of Educ. Hendrick Hudson Cent. Sch. Dist. v. Rowley</u>, 458 U.S.

176, 181 (1982). A FAPE must be designed to meet the unique needs of each individual

child through special education and related services. <u>See</u> 20 U.S.C. 1400(d)(1)(A).

Implicit in the guarantee of a FAPE is "the requirement that the education to which

access is provided be sufficient to confer some educational benefit" on the child. <u>See</u>

<u>Rowley</u>, 458 U.S. at 200. School districts must develop a comprehensive plan – an

Individualized Education Program (hereinafter, "IEP") tailored to the unique needs of the

child. <u>See</u> <u>Rowley</u>, 458 U.S. at 181; <u>see also</u> 20 U.S.C. 1414(d). The IEP is developed

by a team of individuals which includes, <i>inter alia</i>, the child's parents. <u>See</u> 34 C.F.R. §

300.321.

The IDEA repeatedly emphasizes the "importance and necessity of parental

participation in developing the IEP and assessing its effectiveness." <u>See</u> <u>E.H. v. Tirozzi</u>,

779 F.Supp. 53, 57 (D.Conn. 1990)(citing <u>Honig v. Doe</u>, 484 U.S. 305, 311 (1988)). The

statute includes "a comprehensive set of procedural safeguards to ensure that the parents

or guardians of a handicapped child . . . have an opportunity" to participate in, and

contest, decisions affecting the education of their child. <u>See</u> <u>Gadsby by Gadsby v.</u>

<u>Grasmick</u>, 109 F.3d 940, 944 (4th Cir. 1997). These safeguards include a guarantee, to

parents, of an opportunity to participate in the IEP development process.  See 20 U.S.C. § 1415(b)(1). In fact, the statute allows parental participation in the meeting through a variety of means, including "video conferences and conference calls."  See 20 U.S.C. § 1414(f).

In Rowley, the Court established a two-prong inquiry to determine whether a school district has provided a FAPE. See  458 U.S. at 206.  The first prong asks whether the school system has complied with the IDEA's procedural requirements in arriving at a particular child's IEP.  See id.  The second prong asks whether the student's IEP is reasonably calculated to provide meaningful educational benefit.  See id. at 207.  A school system must demonstrate that both requirements have been met to prove that it has provided a FAPE.  See id.

## STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

Pursuant to Fed. R. Civ. P. 56, the Plaintiff hereby submits that the following Statement of Material Facts as to Which There Is No Genuine Dispute:

1.    C.H. is a minor child eligible for special education services.  See Exhibit 7 (hereinafter, "Ex. 7") at B: 2.

2.    C.H. and his parents have been, at all relevant times, residents of the District.  See Ex. 1 at 97: 15-16.

3.    In February 2004, when C.H. was in the eighth grade, his parents unilaterally placed him in the Gow School.  See Ex. 9 at 5.

4.    As settlement of administrative actions commenced by both parties, the District and C.H.'s parents agreed that the District would fund C.H. at the

Gow School for the 2005-2006 school year.  <u>See</u> Ex. 7 at Q: ¶ 1.

5.    As a condition of that settlement, C.H.'s parents agreed that the District would be C.H.'s "stay-put" placement, within the meaning of 20 U.S.C. § 1415(j), if parents requested a due process hearing at any time during the course of the 2005-2006 school year.  <u>See</u> Ex. 7 at Q: ¶ 18.

6.    C.H. attended the Gow School during the 2005-2006 school year, and his parents did not file for a due process hearing during that period.  <u>See</u> Ex. 7 at G.

7.    Over the course of the 2005-2006 school year, C.H.'s mother and the District's Supervisor of Special Programs met in person multiple times.  <u>See</u> Ex. 2 at 140: 2-19.

8.    The District, through the Supervisor, did not seek permission for or attempt to schedule evaluations for the purposes of IEP development until May 30, 2006.  <u>See</u> Ex. 6 at 6.

9.    On June 9, 2006, C.H.'s parent returned the District's Permission to Evaluate form signed, but without a checkmark.  <u>See</u> Ex. 6 at 6; <u>see also</u> Ex. 7 at O.

10.   The District took no further action to schedule an evaluation for C.H. until July 5, 2006.  <u>See</u> Ex. 6 at 7.

11.   A District psychologist evaluated C.H. on August 7 and August 14, 2006.  <u>See</u> Ex. 7 at A: 1.

12.   On August 18, 2006, the District sent a notice of an IEP meeting to the parent, scheduling an IEP team meeting for August 22, 2006.  <u>See</u> Ex. 6 at

10.

13.    On August 22, 2006, an IEP meeting convened.  See Ex. 7 at B.

14.    Over the course of the meeting, the team found C.H. eligible for special

       education services, but took no action to develop an IEP for C.H.  See id.

       at B: 3.

15.    The District did not send to the parent any notice for any subsequent IEP

       meeting.  See Ex. 2 at 113: 17-21.

16.    The District's first day of the 2006-2007 school year was September 5,

       2006.  See Ex. 1 at 48: 21-49: 1.

17.    The District had not developed an IEP for C.H. prior to September 5,

       2006.  See Ex. 7 at K: 2.

18.    C.H.'s parents filed a request for a due process hearing on September 7,

       2006.  See Exhibit 5[8] (hereinafter, "Ex. 5").

19.    C.H.'s parents alleged that the District had committed four separate

       procedural errors and one substantive error in the IEP development

       process.  See id.

20.    As a remedy, C.H.'s parents requested that the District pay C.H.'s full

       tuition and costs for C.H.'s attendance at the Gow School for the 2006-

       2007 school year.  See id.

21.    The Due Process Hearing Panel convened a hearing on C.H.'s claims on

       December 4 and 12, 2006.  See Ex. 1 at 1; see also Ex. 2 at 1.

22.    On December 22, 2006, both parent and the District filed closing

_____

[8] For the convenience of the Court, the citation here refers to the unnumbered first and second pages of Ex. 5.

arguments.  <u>See</u> Ex. 8.

23.    The Hearing Panel issued its decision on January 6, 2007.  <u>See</u> Ex. 9 at 11.

24.    The Panel did not include any determinations of testimonial credibility in its Findings of Fact.  <u>See</u> Ex. 9 at 5-6.

25.    In its Decision, the Hearing Panel found in favor of the District on four of C.H.'s claims.  <u>See</u> Ex. 9 at 10.

26.    The Hearing Panel found in favor of C.H. on one claim, but found that it did not merit awarding the requested relief.  <u>See</u> <u>id</u>.

<u>ARGUMENT</u>

I. **Standard of Review For Summary Judgment**

To grant a motion for summary judgment, the Court must find that there are no issues of material fact as to which there is a genuine dispute, and that the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c).  The party seeking summary judgment must demonstrate an absence of a genuine issue of material fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986) (<u>citing</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986)); <u>see also</u> <u>Burkhart v. Davies</u>, 602 A.2d 56, 59 (Del. 1991).

II. **Standard of Review For Hearing Panel's Decision and Order**

In considering an appeal from a special education due process panel's decision, the Court should apply a modified *de novo* standard of review.  <u>See</u> <u>S.H. v. State-Operated Sch. Dist. of the City of Newark</u>, 336 F.3d 260, 270 (3d Cir. 2003); <u>see also</u> <u>Fisher v. Bd. Of Educ. of the Christina Sch. Dist.</u>, 856 A.2d 552, 557-58 (Del. 2004).

Under this standard, the Court should defer to the panel's findings "unless it can point to contrary non-testimonial extrinsic evidence on the record."  See S.H., 336 F.3d at 270.

If the state administrative panel made determinations regarding the credibility of witness testimony, the Court must accept those determinations unless "non-testimonial, extrinsic evidence would justify a contrary conclusion."  See Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004); see also Fisher, 856 A.2d at 557-58. In the instant case the Panel made no findings of fact based on determinations of testimonial credibility.  See Exhibit 9 (hereinafter, "Ex. 9").  Thus, the Court may conduct *de novo* review of the Panel's findings, deferring to the Panel only to the degree that its findings are supported by extrinsic evidence already on the record.

### III.    The Hearing Panel Erroneously Concluded That There Was No Need For an IEP To Be In Place At the Beginning Of The School Year

The Hearing Panel concluded, as a matter of law, that there was no need for the District to develop and implement an IEP for C.H. prior to the beginning of the 2006-2007 school year because (A) it considered C.H. a transfer student from another school district, (B) it determined that the District was not responsible C.H.'s education during the 2005-2006 school year, and (C) the parents failed to re-enroll C.H. into the District prior to the start of the 2006-2007 school year.  For the reasons explained below the Hearing Panel's findings were factually and legally incorrect and its holding should be reversed.

### A. The Panel Erroneously Analogized C.H.'s Situation to an Out-Of-State Transfer

"At the beginning of each school year, each public agency must have in effect, for each child with disability within its jurisdiction, an IEP."  See 34 C.F.R. § 300.323(a)

(Emphasis added); see also 20 U.S.C. § 1414(d)(2)(A).  The Hearing Panel concluded, as a matter of law, that there was no need for the District to develop and implement an IEP for C.H. prior to the beginning of the 2006-2007 school year.  The Panel concluded that "[n]either the law nor common sense requires that an IEP be in place and fully implemented on the first day of any school year."  See Ex. 9 at 8.  The Panel misstates the law.  The IDEA and it implementing regulations are unequivocal in their requirement that an IEP be in effect at the beginning of each school year.

To explain its departure from clearly established law, the Hearing Panel analogized C.H. to a student who transfers within the State, or a student who transfers from another State, which justified the District's delay in developing and implementing an IEP.  See Ex. 9 at 7-8.  But Delaware law clearly states that students are residents of "the school district in which that student's parents . . . reside."  See 14 Del. C. § 202(e)(1). The Hearing Panel erroneously accepted the District's argument that because C.H. attended school outside of Delaware during the 2005-2006 school year, he should be considered an out-of -state student who transferred to the District at the start of the 2006-2007 school year.  See id.  Citing the Department's Administrative Manual for Special Education Services, the Hearing Panel concluded that a district has 30 days to develop an IEP for an in-state transfer student, or 60 days to develop an IEP for an out-of-state transfer student.  See Ex. 9 at 7.  The Panel concluded, therefore, that the District had "a period of time" to develop an IEP for C.H, but did not specify which specific period of time it thought was appropriate, why it believed that period of time was appropriate, or identify any particular evidence that made C.H. analogous to an in-state or out-of-state transfer student.

The Panel and the District misconstrue state law.  C.H.'s parents resided continuously in the District during the entirety of this matter, meaning that, contrary to the Hearing Panel's holding, C.H. was a resident of the District during the 2005-2006 school year.  Delaware law imposes an obligation on public school districts to provide an education for all students who are "residents of this State."  See 14 Del. C. § 202(a).  Therefore, the Hearing Panel erred as a matter of law in finding that the District was justified in not developing an IEP for C.H. by the beginning of the school year.

Even if C.H. was a transfer student the Hearing Panel, nevertheless, erred in finding that the District did not have to have an IEP in effect for C.H. at the beginning of the school year.  The Hearing Panel relied on 34 C.F.R. § 300.323(e) and (f), and 14 Del. Adm. C. § 925.23.4 and 23.5 in determining that the District had "some period of time" to develop an IEP for C.H.  But the regulations only pertain to a student who transfers within the same school year.  See id.  C.H.'s parents contacted the District during the 2005-2006 school year with the goal of initiating the IEP process so that C.H. could return to the District the next school year.  The regulations do not allow a school district to delay the development and implementation of an IEP under such circumstances. Wherefore, the Hearing Panel erred in all aspects of its analysis of this issue.

### B. The Panel Erred In Finding That the District Was Not Consistently Responsible For C.H.'s Education

Although C.H. attended the Gow School, an out-of-state private school, during the 2005-2006 school year, the District continued to be responsible for his education at all times because C.H.'s placement at Gow was funded and monitored by the District pursuant to a settlement agreement. See Ex. 6 at 3: ¶¶ 1, 4, 6.  The settlement agreement included provisions for the District to review records from Gow and monitor C.H.'s

progress. See Ex. 6 at 3: ¶ 4. The District, as a steward of public funds, has a fiduciary

duty, not only to C.H. and his parents, but to the citizens of Delaware to ensure that when

public funds are used, the services they intend to purchase are provided. Thus, the

District had a continuing fiduciary, contractual, and legal obligation to monitor C.H.'s

placement at Gow during the 2005-2006 school year. Any argument that the District did

not have responsibility for C.H.'s education during the 2005-2006 school year is simply

without merit.

### C. The Panel Erred In Holding that C.H. Was Required to Re-enroll in the District Before the District Became Responsible For His Education.

Neither Delaware law, nor state administrative code, nor local regulations impose

an obligation upon a parent to re-enroll his or her child every school year. Delaware law

imposes an obligation on public schools to provide an education for all students who are

"residents of this State." See 14 Del. C. § 202(a). The state imposes an obligation on

parents that they not enroll their children in more than one "residential district" at one

time. See 14 Del. C. § 202(e)(1). The District itself implements this obligation through a

form seeking information on parental residence, special needs, and transportation

requirements. See Exhibit 10 (attached), Cape Henlopen School District Enrollment

form. No section of this form requires parents to re-enroll children.

Neither the evidence introduced by the District at the hearing, nor legal or factual

citations by the Panel, establish any requirement that the parent "re-enroll" C.H. as a

prerequisite for the District to be responsible for his special education services. By the

admission of the District's own witnesses, C.H. had attended school in the District

previously, and was enrolled in the District at that time. See Ex. 2 at 147: 4-5 (noting the

District's "history that we have on IEP development with [C.H.]"); see also Ex. 6 at 14 (documenting the District's inclusion of a neurological evaluation in its development of a 2003-2004 IEP for C.H.). The District further admitted that it was responsible for C.H.'s special education by beginning the IEP planning process in May 2006.  During the hearing, the Parent offered uncontroverted testimony that she had asked an employee of the District in December 2005 to begin testing C.H. in order to complete an IEP.  See Ex. 3 at 47: 7-19.  The District did not initiate the IEP process at that point, but on May 30, 2006, sought parental permission to evaluate C.H. for IEP purposes.  See Ex. 6 at 6.[9]  In its Closing, the District argued that it began the process in May 2006 "in case [the parent] ultimately decided to return [C.H.] to the District and attempted to do so."  See Exhibit 8 (hereinafter "Ex. 8") at District's Argument 5.  The District's action was in fact an admission of responsibility for developing an IEP for C.H., because federal regulations only require that "public agencies" seek permission from parents prior to conducting evaluations, and the regulations identify a public agency as the state and local education agencies "that are responsible for providing education to children with disabilities."  See 34 CFR §§ 300.300, 300.33 (emphasis added).  By initiating the evaluation process, the District accepted its responsibility for providing education to a child with a disability under IDEA, and was bound to adhere to the concomitant procedures.

The District argued that the parent had not "re-enrolled" C.H. in the District for the 2006-2007 school year, and did not inform the District that she intended to return C.H. to the District.  See Ex. 8 at District's Argument 5.  The District argued that because C.H. had not been re-enrolled there was no obligation on the District to develop an IEP for C.H., and so its failure to do so could not be a violation of IDEA procedure.

---

[9] For the convenience of the Court, the citation refers to the first page of Exhibit 6 at 6.

The Hearing Panel noted that "no regulation specifically relates to the re-enrollment of a child from a private placement."  See Ex. 9 at 6.  Nevertheless, the Hearing Panel held that the District was not required to develop an IEP for C.H. because he was not "enrolled" in the District at the end of the 2005-2006 school year.

Prior to the parent filing a due process complaint, the District had made no indication that there was a need for the parent to "re-enroll" C.H. in the District.  The Supervisor testified at the hearing that she had never sought C.H.'s re-enrollment in the District prior to developing an IEP for the 2006-2007 school year.  See Ex. 2 at 147: 16-21.  The District and parent introduced documentary evidence of correspondence between them spanning May 2006 to October 2006.  No documentary evidence prior to parent's due process hearing request indicated a need for C.H. to "re-enroll" in the District.  See Ex. 6 at 6 (letter from Supervisor to parent dated May 30, 2006)[10]; Ex. 6 at 7[11] (letter from Supervisor to parent dated July 5, 2006); Ex. 6 at 10 (three e-mails from Supervisor to parent, dated August 14 and 18, 2006); Ex. 6 at 11 (letter from Supervisor to C.H.'s private placement dated September 8, 2006).  The first indication that C.H. needed to "re-enroll" in the District was a letter from the District's counsel to the parent on September 15, 2006, replying to the parent's due process hearing request; 10 days after the first day of school.  See Ex. 6 at 12: 2.  The District's contention that it was not responsible for C.H.'s IEP until C.H. "re-enrolled" is undermined by the sheer number of documents predating the first IEP meeting that omit any mention of that requirement and exposes the District's purported "re-enrollment requirement" as a disingenuous manufactured argument with no support in fact or law.

---

[10] The citation refers to the first page of Ex. 6 at 6.
[11] The citation refers to the first page of Ex. 6 at 7.

Further, the settlement agreement resolving the Parent's dispute with the District for the 2005-2006 school year, retains the District's responsibility for C.H.'s education following the 2005-2006 school year. The settlement agreement provided that "[i]f Parents file a subsequent due process hearing request during [C.H.]'s placement at the Gow School, the parties agree [C.H.]'s 'stay-put' placement shall be the District, and not the Gow School." See Ex. 6. at 13: ¶ 18. Thus, the settlement agreement contemplated educational placement for C.H. in the District.

Finally, the credibility of the District's argument that it had no responsibility for CH.'s education because of his enrollment status is simply impugned by its actions. It makes no sense that the District would conduct a psychological evaluation, hold an IEP meeting to review that evaluation and determine C.H's eligibility for special education, and then hold another meeting to develop an IEP for a student for whom it had no responsibility. Thus, the District's "re-enrollment argument" and the Hearing Panel's acceptance of it, is misguided and reversible error.

## IV.   The Hearing Panel Erroneously Concluded That the District Did Not Commit a Procedural Violation By Failing To Issue a Notice for a September 11, 2006 IEP Meeting.

Federal and state laws require parent participation in the development of a child's IEP. "Each public agency must take steps to ensure that one or both of the parents of the child with a disability are present at each IEP Team meeting or are afforded the opportunity to participate." See 34 C.F.R. § 300.322; see also 14 Del. Adm. C. § 925.22. Delaware law requires the school district to notify parents at least ten business days in advance of an IEP meeting to ensure they have an opportunity to attend. See 14 Del. Adm. C. § 925.22.1.1. The meeting must be scheduled at a mutually agreed on time and

place.  See 14 Del. Adm. C. § 925.22.1.2.  The notice of the meeting must include the

time, location, purpose of the meeting, and the names of who will be in attendance.  See

14 Del. Adm. C. § 925.22.2.1.  If neither parent can attend, the school district must use

other methods to ensure parent participation including individual or conference telephone

calls.  See 14 Del. Adm. C. § 925.22.3.  If the school district is "unable to convince the

parents that they should attend," the IEP meeting may be held without the parents but the

school district must maintain detailed records of telephone calls made or attempted and

the results of those calls, copies of correspondence sent to the parents and any response

received, and detailed records of visits made to the parents' home or place of

employment and the results of those meetings.  See 14 Del. Adm. C. § 925.22.4.  Clearly

there is a heavy burden placed on the school district to ensure parent participation in the

IEP process.

The Supreme Court has noted the importance Congress placed on school districts'

compliance with the procedural requirements of the law.

> It seems to us no exaggeration to say the Congress placed every bit as
> much emphasis upon compliance with procedures giving parents and
> guardians a large measure of participation at every stage of the
> administrative process as it did upon measurement of the resulting IEP
> against a substantive standard.

See Rowley, 458 U.S. 176, 205 (1982). (Internal citations omitted).  The District held an

IEP meeting on September 11, 2006, without the parents in attendance and without

having given any notice of the meeting to the parents.  The District offered no evidence at

the Hearing of attempts to ensure the parents' participation in the IEP meeting as required

by law.  Nevertheless, the Hearing Panel concluded that the District did not violate the

IDEA's procedural requirements.   See Ex. 9 at 8.

The Panel determined that there was no procedural requirement that the school issue any notice because, at a meeting on August 22, 2006, the parent had "waived her rights to the 10-day notice for that meeting." See id.  The Panel then determined, without citation to any legal authority, that when IEP development is incomplete at the conclusion of a meeting, there is never a need to issue notice for any subsequent meetings "continuing" the process.  The Panel's conclusion is erroneous, and is contradicted by law.

In accordance with Delaware law, the District sent a notice of the August 22, 2006 IEP meeting, ten business days in advance.  See Ex. 6 at 10. The meeting lasted two hours and focused exclusively on a review of the psychological evaluation and discussion of C.H.'s eligibility for special education.  See Ex. 6 at 18: 1-3.  Once a child is determined by the IEP team to be eligible for special education, another IEP meeting must be held within 30 days to develop an IEP.  See 14 Del. Adm. C. § 925.23.2.  The District argued at the Hearing that the purpose of the September 11, 2006 IEP meeting, was to develop an IEP for C.H.  See Ex. 2 at 111: 19-22.  The District's argument exposes that the September 11, 2006 IEP meeting, was a separate and distinct IEP meeting which required its own notice to the parent ten business days in advance of the meeting. See 14 Del. Adm. C. § 925.22.1.1.

In the instant case, the factual circumstances make the District's failure to live up to procedural requirements even more incomprehensible.  The District and parent convened an IEP meeting on August 22, 2006.  See Ex. 6 at 18.  At the conclusion of that meeting, it was apparent to all parties that an IEP was needed..  See Ex. 6 at 18: 3.  The minutes of the meeting, created by the District and presented at the hearing do not reflect

any agreement on, or even discussion of, when the meeting to develop the IEP should

convene.  The District alleges that there was mutual agreement to convene another

meeting on September 11 – fully three weeks after the August 22, 2006 IEP meeting.

The window was sufficient for the District to have sent even a redundant scheduling

notice.  Given the importance the law places on parent participation in the IEP process, it

was incumbent on the District to ensure the Parents' participation.  The provision of a

notice of the September 11, 2006, IEP meeting was one of many steps required of the

District which it failed to take.

Thus, the Hearing Panel erred in concluding that the District did not violate

IDEA's procedural requirements by failing to give proper notice to the parents of the

September 11, 2006 IEP meeting, or making efforts to ensure their participation.

## V.    The District's Procedural Violations Constituted A Denial of FAPE

Procedural violations constitute a denial of FAPE if

> the procedural inadequacies (i) [i]mpeded the child's right to a FAPE; (ii)
> [s]ignificantly impeded the parent's opportunity to participate in the
> decision-making process regarding the provision of a FAPE to the parent's
> child; or (iii) [c]aused a deprivation of educational benefit.

See 34 C.F.R. § 300.513(a)(2); see also 14 Del. Adm. C. § 926.3.2.  The IEP is the

primary vehicle by which a FAPE is provided.  Honig v. Doe,  484 U.S. 306 (1988).

Failure to have an IEP in effect at the beginning of the school year deprives a child of a

FAPE.  See Gadsby by Gadsby v. Grasmick, 109 F.3d 940, 950 (4th Cir. 1997) (finding

that failure to develop an IEP prior to the beginning of the school year is a serious

violation of the IDEA, and merits reimbursement of parents' consequential unilateral

placement).  The District's failure to have an IEP in effect for C.H. at the start of the

school year deprived him of any opportunity to receive a FAPE. Further, the District's

failure to provide the parents with ten days notice of an IEP meeting to develop an IEP

for C.H., or to ensure their participation in the IEP meeting on September 11, 2006,

significantly impeded the parents' right to participate in the decision-making process and

constituted a denial of FAPE.

The District argued that the failure to develop and implement an IEP prior to the

start of school was inconsequential because it was not obligated to develop an IEP for

C.H., and because "the first two days of school are primarily orientation days." See Ex. 8

at 13. The District also blamed the procedural violations on the parent, arguing that "it

was [the parent's] own scheduling conflicts that prevented the August 22, 2006 meeting,

from being reconvened until September 11, 2006," and that the District was absolved of

any violations when the parent requested a Due Process Hearing. See id. at 14-15. There

is no factual or legal support for the District's argument. Further, the District's argument

is not unlike an argument it made in a previous similar case.

In 1996, a Delaware hearing panel considered the actions of this District in failing

to provide an IEP for a student returning from a private placement funded through a

settlement agreement. See Cape Henlopen Sch. Dist., 24 IDELR 1087 (1996), (attached).

The hearing panel in that case noted that "[b]y late July or early August the District had

at least constructive knowledge that [the child] was home," but the District failed to

gather information to timely revise the child's IEP. See id. at 1094. The panel rejected

the District's rationale for why it was unable to timely complete an IEP. "The excuse

that relevant District officials were on vacation and changing assignments is inadequate.

Too much time, effort and resources had been devoted to [the child] by that point, and his

25

needs were too great, to permit him to fall through the cracks in this fashion." See id. at 1094.

In yet another case, a state hearing panel found that it was inappropriate to place the responsibility on parents for timely scheduling IEP development meetings. "To say that the parents asked for it to occur this way is too easy[; t]he Statute says that responsibility for the IEP meeting is on the school, not the parents." See In Re: Student with a Disability, 27 IDELR 1170 (1998) (attached).   The panel found that procedural violations, leading to the absence of an appropriately developed IEP, were violations of the school district's statutory responsibility and led to a denial of FAPE.  The panel decided that such violations justified the parents' decision to unilaterally place their child in a private school.

In the instant case, although the parent requested an evaluation in December, 2005, the District did not initiate the evaluation process until May 30, 2006.  When the parent mistakenly returned an incomplete "Permission to Evaluate" form (a checkmark was lacking), the Supervisor took no action to remedy that problem for nearly four weeks.  Ex. 6 at 7.  The parent promptly returned the completed form (with the checkmark) as soon as she was asked but it took the District another four weeks to schedule an evaluation.  See Ex. 6 at 19.  The psychological evaluation was conducted on August 7, 2006, eight months after the parent's initial request.  See id.  The IEP meeting to consider the results of that evaluation occurred on August 22, 2006.  Thus, as with the two cases noted above, the District's attempt to blame the parent for its dilatory actions is without merit and its procedural violations resulted in  no development of an IEP prior to

the start of the school year and exclusion of the parents from the decision-making process and thus denied the student a FAPE.

### VI. The Parents are Entitled to Be Reimbursed For The Costs of The Gow School.

If a school district fails to offer a child with a disability a FAPE and the child's parents place the child in a private school that can meet the child's needs, a court or hearing panel may require the school system to reimburse the parents for the costs of the private placement. See 20 U.S.C. §1412(a)(10)(C); see also Sch. Comm. Of Burlington v. Dept. of Educ., 471 U.S. 359, 370 (1985). As noted above, the District failed to develop an IEP for C.H. at the beginning of the school year. With no IEP and, consequently, no offer of an appropriate program from the District designed to meet C.H.'s needs, the parent was left little choice but to return C.H. to the school in which he had been successful. The District conceded at the hearing that the Gow School is an appropriate placement for C.H. See Ex. 1 at 220: 8-12. Because the District failed to offer an appropriate placement and educational program for C.H., and the parents took it upon themselves to provide both appropriate program and appropriate placement, the Court should award reimbursement for those expenses to parents.

### CONCLUSION

WHEREFORE, for the reasons set forth in this brief the Plaintiffs respectfully request that the Honorable Court reverse the ruling of the State Hearing Panel and enter judgment in favor of the Defendants.

RESPECTFULLY SUBMITTED,

/s/ Wayne D. Steedman
Wayne D. Steedman, Esq.
Federal Bar No. 9474
Callegary & Steedman, P.A.
201 N. Charles St., Suite 1402
Baltimore, MD 21201
(410) 576-7606
wayne@callegarysteedman.com
Attorney for Plaintiffs

/s/ Bruce L. Hudson
Bruce L. Hudson, Esq.
Delaware Bar No. 1003
Law Office of Bruce L. Hudson
800 N. King St., Suite 302
Wilmington, DE 19801
(302) 656-9850
delaw@brucehudsonlaw.com
Attorney for Plaintiffs

<u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing, including all attachments, was filed this 24th

day of December, 2007, and was served electronically on the parties.

/s/ Wayne Steedman
Attorney for Plaintiffs

28

1

4. The hearing in this matter will be conducted commencing August 27, 1996, at the Administration Building of the [District City 1] Public Schools, [District City 1 Address], [City 1], Minnesota, at 9:00 a.m. and continuing thereafter on consecutive days or as otherwise ordered.

5. The parties will exchange copies of all documents they intend to introduce at the hearing and the names of all persons they intend to call as witnesses at the hearing no later than August 20, 1996.

---

**Delaware**                         **August 6, 1996**

## Cape Henlopen Sch. Dist.

Before Toland, Deiner and Monhait.

### Summary

The parents of a 12-year-old middle school student with attention deficit hyperactivity disorder, oppositional defiant disorder and developmental reading disorder requested a due process hearing in May of 1995. In response to the parent's request, the district agreed to place the student in a private residential summer program. Prior to this agreement, the district developed, without the input of the parents, an incomplete IEP for the sixth grade. This IEP called for the student's placement in special education for reading, language arts and math, occupational therapy and counseling. The student made some progress in the summer program, but was withdrawn as a result of behavior concerns. The student refused to attend school when the 1995-96 school year started, and the parents requested a due process hearing, seeking a district funded residential placement. The student was placed on homebound instruction until the placement dispute was resolved. In November of 1995, the district held an IEP meeting which the parents refused to attend. At this meeting, it was decided the student would be placed in a TAM classroom with 12.5 hours a week of special education in a resource room, mainstreaming for science, social studies, art and lunch, provided a special education teacher with training in the Orton-Gillingham method, home tutoring and counseling.

*HELD:* for the district, in part.

The hearing panel determined the student made educational progress in the district program, showing advances in his academic performance and better behavior, especially in the fifth grade. In examining the program offered, the panel noted the parties agreed the student required a structured program with one-on-one instruction, interaction with peers, and a multi-modal approach to reading. The panel concluded the program offered by the district which provided placement in a regular program with special education to address the student's needs was appropriate and provided the student with an opportunity to make educational progress in the least restrictive environment. Since the district placement

was appropriate, the parents' request for a private, residential placement was denied. The panel next addressed the alleged procedural violations committed by the district, and found the district committed substantial procedural violations when, after the student withdrew from the summer program, the district failed to complete the student's IEP for the sixth grade. The district's failure to complete the IEP was, according to the panel, a significant procedural violation. As a result of this violation, the panel ordered the district to provide the student with compensatory education consisting of one-on-one reading, language arts, spelling and math tutoring for 10 hours a week during the summers of 1996 and 1997, and during school vacations of a week or more during the 1996-97 school year. Additionally, the district was required to furnish the student with an in-home tutor for at least eight hours a week during the 1996-97 academic year.

---

### Opinion of the Panel

[ ] is a 12-year-old boy who has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") (for which he is medicated with Ritalin), a mild to moderate Oppositional Defiant Disorder (which, among other things, leads him to challenge authority and engage in other inappropriate behaviors) and Developmental Reading Disorder. (Pl3, D10, P48, D42).[1]

[ ] fortunately, also has academic and personal strengths. Intelligence testing has generally rated him in the average to above average ability range. His teachers describe him as a complex child who is capable of being curious, charming, excited by learning, a pleasure to be with and, at times, a model student. Like many children, he can also misbehave, be withdrawn, sullen and angry. While there is evidence that during his fifth grade academic year in 1994-95 aspects of [ ]'s reading performance tested as low as the second grade level, there is also evidence that his actual performance with his teachers has been at the fourth grade level.

[ ]'s struggles with reading and writing began when he was in kindergarten. The Cape Henlopen School District ("District") placed him in a transitional classroom during first grade, and a TAM classroom for the second, third and fourth grades. As a fifth grader, [ ] received full-time special education services as a student with learning disabled status, including 12.5 hours per week of small group instruction for reading, English and spelling.

Increasingly frustrated by what they perceived as the inadequacy of [ ]'s academic progress, in May 1995 [ ]'s parents (the "[ ]") requested a due process hearing pursuant to 14 *Del.C.* § 3135, contending that the District had been unable "to implement an effective reading program" for [ ] (P71, D59). The specific relief requested was private placement.

The [ ] and the District resolved the due process request with an agreement that, among other things, required the District to fund [ ]'s placement at a private institution, Dunnabeck at Kildonan ("Kildonan") in Amenia, New York, for the summer of 1995. [ ] attended Kildonan at District expense. His parents,

however, withdrew him in mid-summer for reasons that will be described below.

At the start of the 1995-1996 school year, [ ]'s parents found themselves in conflict with the District over [ ]'s placement and program. They again requested a due process hearing seeking private placement, specifically at the Greenwood School in Putney, Vermont, at District expense. Also, when [ ] resisted attending school in 1995-96, the [ ] permitted him to stay home for the year. The District provided a part-time homebound instruction program as an interim measure, with which the [ ]s are dissatisfied.

The hearing was held before this Panel, appointed pursuant to 14 *Del.C.* § 3137, on November 27, 1995 and February 9, 1996.[2] At the conclusion of hearing testimony, the Panel requested two additional pieces of evidence: a deposition of Diana King to elucidate [ ]'s experience at Kildonan; and a psychological evaluation. Thereafter, the parties completed post-hearing briefing and the District and the State Department of Public Instruction ("DPI")[3] attended a post-briefing argument session.[4] The Panel hereby renders its decision.[5]

The Panel's salient impression from the hearing is that [ ] is a child at risk, presently caught between: (a) parents who are understandably frustrated with his situation, distrustful (to some extent understandably) of the District and, to some extent, attempting to relieve their frustrations by transferring responsibility to others; (b) representatives whose zealous advocacy has forced the District to focus attention on [ ] but some of whose judgments on [ ]'s behalf are questionable; and (c) a District that has not been as attentive to [ ]'s needs as it could have and should have been, and that has at times dealt clumsily with [ ] and his family.

Our analysis of the evidence, guided by the applicable legal standards as elucidated under prevailing case law, leads us ineluctably to the conclusion that the District has demonstrated it is capable of providing [ ] a free, appropriate, public education. The request for private placement is therefore denied. We conclude, however, that [ ] is entitled to compensatory educational services for certain District violations of proper procedure.

## I.

By the end of his kindergarten year in the spring of 1990, [ ]'s teacher identified problems with short attention span, learning difficulties, fine motor skills and social behavior. The District was prepared to conduct an educational evaluation but before it could do so, the [ ] had [ ] independently evaluated by Dr. Rosalind Kingsley in late August and mid-September of 1990. Dr. Kingsley's report noted that Mrs. [ ] had been diagnosed with multiple sclerosis and Mr. [ ] who was only 37 years old, had already had a "mild coronary due to stress." Mrs. [ ] also stated that when [ ] is together with his twin siblings, approximately three years younger, "there are problems." Dr. Kingsley noted that Ritalin made a "dramatic" difference in [ ]'s behavior. After administering a battery of tests, she concluded that he had a "developmental delay in quantitative areas and also in motor skills." She found strengths in his "verbal and perceptual performance. His vocabulary is excellent and he expresses himself very well." She opined that [ ] "should be able to manage himself in a regular classroom situation,

with a period in the learning center for quantitative skills and some fine motor work to help him with handwriting." (P5, D2).

In September 1990, the District placed [ ] in a self-contained transitional first grade classroom with a trained special education teacher. In January 1991, [ ] was formally classified as "learning disabled." (P7, D4). An individualized education plan ("IEP") was developed for him which, among other things, provided for 25 hours per week of special education. (P8, D3). Testing conducted in the spring of 1991 indicated that [ ] was "on grade level in most academic areas" and found that [ ] had a strong vocabulary, but noted weaknesses in reading, spelling, language, arithmetic, impulsivity and distractibility. (P9, D6).

In September 1991, the beginning of his second grade year, [ ] began to receive special education services in a "TAM" classroom as a learning disabled student, receiving instruction from both a regular education teacher and special education teacher. His IEP provided for 12.5 hours of special education weekly in reading, language arts, spelling and math. (P9, D6).

An October 1991 report by his special education teacher (P10, D7) noted that [ ] had begun the year with frequent behavioral problems and a frequent excuse of "Mom said I didn't have to." The report also noted reading problems. The report went on to state that in "the past two to three weeks, [ ] has completely turned around both in the regular classroom and in the resource room." His behavior had improved and his academic progress had been "significant," even though reading continued "to be a struggle for him."

In November 1991, Mrs. [ ] discussed with District officials her concerns about [ ]. She perceived that [ ] was having "extreme difficulties in all academic areas" and that he was becoming a behavior problem at home and in school. Among other things, she sought more individualized instruction time. The District helped arrange an evaluation of [ ] at the A.I. duPont Institute. (P10A, D8; I,14-15).

A.I. duPont provided an educational evaluation and a psychological report. The former noted weaknesses in visual motor integration, visual perceptual ability, reading skills and arithmetic. It noted strengths in receptive language, and adequacy in expressive language. It recommended a number of strategies including "a multi-sensory approach" to reading. (P11, D9).

The psychological report found [ ] to be of average intelligence, with weaknesses in reading (essentially at a first grade level), spelling and arithmetic. Among other strategies, the report recommended teaching [ ] from material which is meaningful to him and counseling for his parents to help them "learn more effective, yet nurturing ways to manage his behaviors." (D10).

On January 16, 1992, a conference was held at A.I. duPont involving the A.I. duPont evaluators, the [ ]es, Janis Hanwell (the District's special programs facilitator) and Nancy Hart-Moore, [ ]'s teacher. All apparently agreed that [ ] had significant weaknesses in reading and arithmetic. Ms. Moore, however, reported that his classroom performance was consistently better than his test results. (P12, D11).

Standard Achievement Tests administered to [ ] in March of 1992 indicated some progress in almost all academic areas. (P16A, D14). It noted continued strength in vocabulary and continued weakness in reading, spelling, language, arithmetic, impulsivity and distractibility. In almost all academic areas, his

functioning was at a late first grade to early second grade level. His IEP for his upcoming third grade year was somewhat revised from the prior year IEP. His placement continued at level 3, with a part-time resource room including 12.5 hours of special education weekly in reading, spelling, language and math. *Id.*

For his fourth grade year commencing in September 1993, [ ] was enrolled in Lewes Middle School. [ ] was placed in a TAM classroom and received a minimum of 12.5 hours per week of special education. [ ]'s IEP for the year does not contain the results of testing apparently performed May of 1993. (P20, D18). Academic testing administered in May 1994 found [ ] functioning in a late first to mid-second grade level on many reading related areas, with two scores in the third and fourth grade range. (P26, D24). His report card for the year (P30, D25) indicates that most of his teachers found him a "pleasure to have in class" and that he had demonstrated good effort and improvement in many subjects.

For [ ]'s fifth grade year, his home school became Milton Middle School as a result of a redistricting in school attendance areas. In April 1994, Mrs. [ ] requested an attendance deviation for the 1994-95 school year so that [ ] could remain at Lewes Middle School. The [ ] supported the request with a letter from a pediatric neurologist which stated: "Because we are just beginning to make some therapeutic progress with [ ] [in treating his ADHD], any attempts to assure that his educational environment remains stable would be greatly appreciated" (P24, D21). The District Board of Education approved this request (P28, D26). [ ]'s IEP prepared before his fifth grade year showed his levels of performance as follows: basic reading skills—grade level 1.8; word recognition—1.5; oral reading—1.0; reading comprehension—2.4; math computation—third grade; math application—third grade(P29, D27).

On June 8, 1994, Mrs. [ ] participated in an IEP meeting for [ ] The IEP provided for continued level three treatment, including 12.5 hours of special education weekly. Mrs. [ ] did not sign this IEP, but she did not object at the meeting. By letter dated August 29, 1994 (P33 D30), Mrs. [ ] formally objected to this IEP and advised the District that she was retaining Ms. Arons as a consultant.

By letter to Ms. Hanwell dated October 6, 1994 (P39, D34), Mrs. [ ] requested an IEP meeting for November 9, 1994 at 2:00. She advised that Ms. Arons and Ms. Watson would be present along with Mr. [ ] and requested attendance by the "complete MDT team." At the meeting, [ ]'s teachers reported that he was making progress, but Mrs. [ ] expressed a desire for a complete change in program more addressed to his individual needs. As a result of this meeting, the District team agreed to additional psychological testing, a comprehensive reading assessment, and occupational therapy evaluation, a re-work of [ ]'s IEP, consideration of the feasibility of more one-on-one instruction, and a review of the need for behavioral evaluations (P45, D39; I, 51-57).

In preparation for the evaluations resulting from the November 9 meeting, Vicky Friend, [ ]'s special education teacher, prepared a summary of his status. She noted that "[ ] continues to experience difficulty in all written language related areas with decoding and encoding being most problematic." Behaviorally, she noted that "at times, [ ] shows genuine concern,

consideration and generosity to others. However, at other times, he has difficulty accepting help from teachers and peers. He complains often when given instruction . . . , is at times disrespectful to *anyone*, defiant, refusing to comply all of which impact negatively on academic growth" (P46, D40). A teacher report form noted [ ] performing "far below grade" in all academic subjects except math at which he was noted as performing "somewhat below grade." *Id.*

David Carnevale, a school psychologist employed by the District, performed a psychological evaluation. His report (P48, D42) found [ ] to have average intellectual ability but achieving significantly below that ability in reading and spelling. The report also noted that [ ] responded better in one-to-one situations. He had, however, a tendency to respond "in an impulsive and rapid manner, with minimal reflection or consideration before beginning to answer." Mr. Carnevale recommended a number of specific strategies to assist [ ]'s learning process.[6]

The District contracted with Educational Service Inc. of Southern Delaware ("ESI") to perform a reading assessment. Marie Sexton, the ESI educational diagnostician, reported that [ ] was "generally cooperative and friendly," and "a diligent and willing worker" and that "he tended to be highly critical of his own performance . . ." (P51, D43). She found [ ] to be in the bright average to low superior range of verbal mental ability. His reading ability tested in the mid-second grade range, spelling ability at the late first grade range and arithmetic ability in the middle third grade range. The report recommended a number of learning strategies to use with [ ] and a number of modifications of regular classroom requirements to help [ ] better succeed. The report noted that [ ]'s teachers "have recognized many of [ ]'s individual learning needs and have made several requirement modifications in order to allow [ ] to best express what he has learned." As a specific strategy to assist [ ]'s reading skills, Ms. Sexton recommended a program called "Recipe for Reading" which she described as a multi-sensory approach "formulated from the Orton-Gillingham Method."

The District also obtained an occupational therapy evaluation on [ ] which recommended occupational therapy services weekly to address handwriting, fine motor and motor planning skills (P50, D44).

A multidisciplinary team meeting occurred on March 20, 1995 to review the results of these reports (D50). The recommendation of the team was to continue [ ]'s classification as a learning disabled student needing special educational programming.

An IEP meeting was held on March 27, 1995, which included [ ]'s current teachers, Ms. Hanwell, the [ ], Mr. Carnevale, Ms. Watson and Ms. Arons. The results of the evaluations were reviewed. [ ]'s teachers reported significant improvements in his behavior since the Fall, and that they did not regard his behavior as a separate issue. [ ]'s special education teacher, Ms. Friend, presented draft goals and objectives for certain academic subjects. The meeting notes indicate that Ms. Arons argued for more specific objectives for decoding. The notes also indicate that a number of options for were discussed, including [ ]'s attendance at Milton Middle School (his home school if he had not been granted an attendance deviation), where the District had staff trained in a multi-sensory approach to reading instruction. The participants also discussed the possi-

bility of after-school and Summer tutoring. Ms. Hanwell indicated that she could most likely find a tutor for after-school assistance, since the individuals with the requisite training were already certified teachers. The [ ] said they did not want [ ] tutored after school because of his ADHD. The meeting notes say that Ms. Hanwell would "do what she can to attempt to find someone trained who can do the tutoring during the day w/in the next few weeks." One decision was reached: to add occupational therapy services to [ ]'s IEP (P59, D51).[7]

An April 18, 1995 memorandum to Ms. Hanwell from Ms. Arons asserted that [ ] needed more intensive reading instruction. Ms. Arons said that "given the geography of your area, it is understandable that there are problems in finding the type of one-on-one instruction that this youngster needs." Ms. Arons suggested placing [ ] at Kildonan for the Summer and utilizing the Kildonan staff to "begin to develop an Orton program in the District that would not only serve [ ] but the rest of the region's dyslexics as well" (P67, D56).

By a notice of meeting dated May 9, 1995, the District scheduled an IEP meeting for May 31, 1995. The notice stated that the meeting was scheduled "as per parental request" (P70, D57). The [ ] responded with a letter dated May 12, 1995 requesting a due process hearing. They identified the issue as the District's inability "to implement an effective reading program" for [ ], and requested private placement (P71, D59).

On May 26, 1995, Ms. Hanwell's secretary Rhonda called Mrs. [ ] to attempt to reschedule the May 31 IEP meeting (P70A, D64, D67, I, 76-78). Mrs. [ ] said she thought the IEP meeting would not proceed due to her request for a due process hearing. Rhonda told her that the meeting was still planned. Mrs. [ ] said she would get back to Rhonda as soon as she talked to Ms. Arons. There were, however, no further communications. See also P81, D72.

The meeting went forward as scheduled without the [ ] or their representatives. The minutes of this meeting (D67) indicate that [ ]'s teachers reported significant academic progress in his fifth grade year. In reading decoding, for example, he had mastered several of the objectives from his prior year IEP, and in relevant testing areas he had advanced one to two grade levels. In reading comprehension he had advanced from a mid-second grade level to late second grade beginning/middle third grade; in oral comprehension he had demonstrated ability to understand fourth and fifth grade material. Spelling remained a weakness. In math computation he had advanced from the beginning/middle third grade level to the fourth grade level. See I, 178-179. The minutes indicated agreement to offer [ ] individual Summer tutoring in reading at an average of five hours per week over a six to eight week period. The team also agreed that some participation in regular classrooms was a necessary and important component of [ ]'s continued social development. The team wrote a draft IEP with goals that differed materially from the prior year's IEP, and contemplated special education services in reading and language arts (including written expression, mechanics and spelling) and mathematics. In addition to individual Summer tutoring in reading, the IEP contemplated occupational therapy and small group counselling (P75, D66, P75A, D67).

In light of the [ ] request for a due process hearing, the District petitioned the Interagency Collaborative Team ("ICT")

to review [ ]'s case. Ms. Hanwell presented the case at a meeting on June 6, 1995. The ICT agreed with the District's position that it was able to provide [ ] with a free appropriate public education (P80D69,P80A).[8]

Thereafter, the District decided to convene another IEP meeting to provide the [ ] another opportunity to participate in the development of [ ]'s IEP for his sixth grade year. A meeting was scheduled for June 30, 1995 at 1:30 p.m., coupled with an offer to reschedule if the time were not convenient (P81, D72).

In mid-June, [ ] received his report card for the last quarter of his fifth grade year (D73). It contained statements like "conscientious about work," "courteous and cooperative," "pleasure to have in class," "adequate progress shown," "has shown some improvement," and "is creative and imaginative." [ ] was promoted to sixth grade.

At the due process hearing on June 21, 1995, the parties resolved the due process request with a stipulation and order (the "Agreement"). (P84; D75.) Among other things, the Agreement required that [ ] be placed at Kildonan for the 1995 summer session at the expense of the District and DPI.

In light of [ ]'s placement at Kildonan for the Summer of 1995, the IEP meeting previously scheduled for Friday, June 30, 1995 was postponed. Ms. Hanwell wrote the [ ] that if "we plan to meet after [ ] completes the summer session, we will have the benefit of any new diagnostic information provided by [Kildonan] regarding [ ]'s levels of performance upon entering the sixth grade." Ms. Hanwell requested that the [ ] contact Dr. Nancy Feichtl (District director of elementary and special programs, I, 335) to schedule the IEP meeting in August (P83, D74).

[ ]'s time at Kildonan was academically successful. The one-on-one tutorial sessions helped him, learn, and his spelling, writing and reading as well as his confidence in his abilities improved (P86; D76; II, 48). His stay there, however, was cut short. The reason for the early end to his stay there is the source of some controversy. A letter from Diana King, Kildonan's summer program director (King 3), dated July 26, 1995 (P86, D76), stated:

> Unfortunately, we were unable to sustain him due to behavioral reasons.
>
> [ ] needed inordinate amounts of supervision, far beyond what we were able to provide. He antagonized and provoked other students ceaselessly. The net result of his behavior was that his peers were bent on revenge the moment a counselor turned his or her back . . .
>
> Concerned by his behavior, the Program Director tried to elicit support from his parents, but was told that it was their expectation that we should be able to manage his behavior in this setting.

Ms. King went on to say that [ ]'s "only hope lies in a residential setting" and recommended the Greenwood School. The District was shown as a copy recipient on the letter.

While a reader of the foregoing could reasonably conclude that [ ] was dismissed from the program for misbehavior, at the hearing Mrs. [ ] testified that Kildonan was willing to keep [ ] for the remainder of the Summer and that the [ ] decided

to withdraw him because of concerns for his physical safety, resulting from fights with other students. (II, 48, 96-99.) On hearing this testimony, the Panel requested that testimony be obtained from Ms. King, so that the record would be clear on [ ]'s experience at Kildonan. Ms. King essentially confirmed Mrs. [ ]'s account (King 8, 30, 33). Ms. King also confirmed that Kildonan's Program Director had sought the [ ] support in managing [ ]'s behavior. The Program Director had asked the [ ] to talk to him by telephone or on visiting day and admonish him to behave better. According to Ms. King, "The parents were unwilling to get involved in the behavior problems" (King 9-10).

The District does not deny having received a copy of Ms. King's July 26, 1995 letter. The District, however, did nothing to initiate an evaluation of [ ]'s summer progress or to convene the IEP meeting it had postponed from June. While the [ ] apparently visited Greenwood School and obtained an enrollment contract for [ ] (P88, P88A), they did nothing to communicate with the District about [ ]'s upcoming year until a memorandum dated September 4, 1995 from Ms. Arons to the District's then attorney, Barbara Crowell (P89). Ms. Arons' memo stated that "Kildonan terminated [ ]'s enrollment because his needs were too severe and extensive for its program."[9] Noting Ms. King's recommendation for residential placement and suggestion of the Greenwood School, Ms. Arons raised the possibility of a temporary placement of [ ] at Greenwood at public expense.

Mrs. [ ] heard nothing from the District about [ ]'s sixth grade year until receipt of a letter the day before school started informing her that [ ] was to attend Milton Middle School. She protested by telephone, asserting that the District had agreed at the June due process hearing that [ ] could continue to attend Lewes Middle School. See P102, ¶ 19. Mrs. [ ] made further telephone calls and questioned how the District had formulated a program for [ ] without having convened a meeting to complete [ ]'s IEP. When school started, [ ], according to Mrs. [ ], refused to go. She said he was so upset at the idea of attending Milton Middle School that he was vomiting (II, 53-56, D77). Over the next several days, a number of communications between Mrs. [ ] and District officials occurred. The District offered a prompt IEP meeting to address [ ]'s situation. Mrs. [ ] expressed willingness to attend the meeting, but refused to come without Ms. Arons whom, Mrs.[ ] said, she was unable to contact. (D77; III, 52-56.)

By letter dated September 8, 1995 (P90, D78), the [ ] requested another due process hearing, specifically seeking placement at the Greenwood School. The District apparently received this demand on September 11, 1995 (D77).

Mrs. [ ] also spoke to Dr. Kingsley and obtained a letter in which Dr. Kingsley certified that due to "significant anxiety and apprehension about returning to a school setting he was previously unable to handle," [ ] should receive homebound instruction until his placement was resolved (P91, D79; III, 54-55). Dr. Kingsley wrote this letter without meeting with or examining [ ] (II, 10; 140-141).

An IEP meeting was convened on September 28, 1995, attended by District officials, the [ ] and Ms. Watson. Ms. Watson insisted that the only acceptable result for [ ] was a residential placement. The [ ] also sought homebound instruc-

tion until [ ]'s placement was resolved. The parties agreed on homebound instruction based on certain modifications to the May 31, 1995 IEP as an interim measure until [ ]'s placement was resolved through the due process mechanism. The District, however, did not believe that homebound instruction was an appropriate placement for [ ] (I, 361-362). At the [ ] request, Orton Gillingham methodology was written into the IEP goals for spelling and reading decoding. The District offered to provide [ ] with after-school tutoring at Milton Middle School in addition to the homebound instruction. The [ ] declined this offer (P96, D82, P95, D83). In light of [ ]'s experience at Kildonan and based on Kildonan's reports, counselling was added to the IEP as an additional resource. (II, 22; D89.) The District concedes that the IEP developed at the September meeting was an incomplete draft. (II 29-30.)

Consequently, the District scheduled a follow-up IEP meeting for November 15, 1995. Although invited, the [ ], through their representative, declined to attend. A memo from one of their representatives to Ms. Crowell noted that the only acceptable arrangement was private residential placement. (D85.) The November IEP meeting went forward without the [ ] or their representative. The team agreed that continued placement in a TAM classroom in Milton Middle School was appropriate. [ ] was to be placed in a part-time resource room receiving 12.5 hours of special education weekly, including instruction in language arts with a special education teacher trained in the Orton-Gillingham method. The team concluded that Milton Middle School was the appropriate school in the District for [ ] because it had the most teachers trained in the Orton-Gillingham method and his program could be overseen by Ms. Hanwell who by then was its Assistant Principal and was familiar with [ ] and his needs. The team also agreed to continue [ ]'s homebound tutorial after his return to school and to offer counselling. (D88; II, 18-29.)

For the entire 1995-1996 school year, [ ] did not attend school, but received homebound instruction which consisted of approximately four visits per week totalling 5-8 hours, from Marianne Kittel-Hayes, a special education teacher experienced with ADHD children and having some training in Orton-Gillingham methodology. (I, 405-414, 425-427; III, 58.)

The Panel was extremely concerned about [ ]'s not having attended school in 1995-1996 and wanted to gain an appreciation of [ ]'s current emotional condition and the implications that had for future placement. Accordingly, at the conclusion of the hearing, the Panel requested a current psychological evaluation.[10] The Panel expressly directed that the parties agree on the professional who would perform the evaluation and offered assistance in identifying a "neutral" professional.

The [ ] and their representatives unilaterally decided, without the District's concurrence, to have [ ] evaluated by Dr. Craig A. Porterfield, a psychologist they had previously consulted. (III, 62.) To prevent further delay, the Panel received Dr. Porterfield's evaluation to use "in any manner [we] deem appropriate," notwithstanding the [ ] failure to comply with our request that the evaluator be mutually agreed upon.

We note first that nothing in Dr. Porterfield's report states that [ ] is school-phobic or so emotionally affected that he is unable to attend school. The report does state that [ ] claimed that other children "were beating him up." There is no evidence

in the record, however, that would support that assertion as to [ ]'s experiences in District schools (as opposed to Kildonan). There is also evidence in Dr. Porterfield's report that [ ] was at times less than candid with Dr. Porterfield (e.g., admitting he had simply pretended not to understand particular questions).

Dr. Porterfield concluded that [ ] "could meet eligibility criteria for serious emotional disturbance"—a depression. He based this conclusion, however, entirely on Mrs. [ ]'s report. He noted that [ ] "denied feelings of depression" and reported "that his mood is usually happy and funloving." Dr. Porterfield found [ ]'s affect "appropriate throughout the session." Dr. Porterfield also noted that when, during the interview, [ ] exhibited inappropriate behaviors and was confronted about them, his behavior improved.

Dr. Porterfield found Mrs. [ ] to be significantly "upset about [ ]'s school problems"::

> My sense was that the mother was unable to gauge interpersonal cues or to focus on the effect of her behavior on others once she started talking about these upsetting issues. . . . The mother also seemed to be very unrealistic in the manner in which she blamed professionals and exonerated [ ] for some of the conflicts that [ ] had with professionals.

As to [ ]'s educational placement, Dr. Porterfield opined: "It seems unlikely that a special education placement for emotionally disturbed students would meet [ ]'s needs unless the placement provided an instructional program similar to the one provided at Kildonan." He recommended that Mrs. [ ] "be more supportive of professionals who work with [ ] . . . and stop blaming professionals for all of [ ]'s behavior problems." He also recommended that physicians place [ ] on antidepressive medication.

## II.

Both federal and state law require the District to provide [ ] with a "free appropriate public education" ("FAPE") (20 U.S.C. § 1401, 14 Del.C. 1320). Board of Education v. Rowley, 458 U.S. 176, 102 S.Ct. 3034 (1982), is the seminal Supreme Court decision elucidating the statutory requirement. The Court said that FAPE "consists of educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." 458 U.S. at 188-189, 102 S.Ct. at 3042. See also, 458 U.S. at 203, 102 S.Ct. at 3049. According to the Supreme Court, however, the law does not require a maximization of each child's potential. 458 U.S. at 189-190, 102 S.Ct. at 3042; 458 U.S. at 196-200, 102 S.Ct. at 3046-3048. Rather, the Court held that the law was designed to provide a "basic floor of opportunity" by assuring handicapped children "access to specialized instruction and related services which are individually designed to provide educational benefit. . . ." Rowley, 458 U.S. at 201, 102 S.Ct. at 3048. At bottom, the requirement is that the education provided must be "sufficient to confer some educational benefit" upon the handicapped child. 458 U.S. at 200; 102 S.Ct. at 3048. The level of benefit, however, must be "meaningful" and not de minimis. Polk v. Central Susquehana Intermediate Unit, 853 F.2d 171, 180, 183 (3d Cir. 1988). The law requires an individual plan likely to produce educational progress, not regression or trivial educational advancement. Board of Education of East Windsor Regional School District v. Diamond, 808 F.2d 987, 991 (3d Cir. 1986).

Residential placement is among the "related services" that may be an integral part of providing basic educational benefits to a learning disabled child. Kruelle v. New Castle County School District, 642 F.2d 687 (3d Cir. 1981), is the seminal Third Circuit decision on residential placements. Kruelle prescribes an inherently factual analysis for determining the need for residential placement:

> Analysis must focus . . . on whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process.

Id., 642 F.2d at 693. While assessing the link between residential placement and the child's learning needs, courts, and therefore this Panel, must also weigh federal requirements that children with disabilities be removed from the regular educational environment only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services "cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(B). This requirement is often referred to as placement in "the least restrictive environment." 34 C.F.R. §§ 300.550-300.554. A particular environment is a viable alternative, however, only if it is one in which "educational progress rather than educational regression can take place." Diamond, 808 F.2d at 992. See Kruelle, 642 F.2d at 695.

In Delaware, 14 Del.C. § 3124 provides the legal standard for residential placement. The statute states, in pertinent part:

> Private placement with financial aid shall be granted only to a . . . handicapped person [who] . . . cannot benefit from the regularly offered free appropriate public educational programs. [Emphasis added.]

This statute is consistent with federal decisions interpreting the least restrictive environment standard to require that public schools make all appropriate efforts to include learning disabled students "in school programs with nondisabled children whenever possible." Oberti v. Board of Education of the Borough of Clementon School District, 995 F.2d 1204, 1215 (3d Cir. 1993), citing Daniel R.R. v. State Board of Education, 874 F.2d 1036, 1048 (5th Cir. 1989).

Additionally, the burdens of proof and persuasion in a proceeding such as this are upon the District and DPI. 14 Del.C. § 3140.

Applying the foregoing authorities to the case at hand defines the issue before the Panel. We must decide whether the District has satisfied its burden and established that the District offers "free appropriate public educational programs" from which [ ] can benefit. We conclude that the District has satisfied that obligation.

## III.

### A.

The record before the Panel demonstrates that [ ] has made academic progress that, although not as great as would be legitimately anticipated for him, cannot fairly be characterized as trivial or *de minimis*. In particular, [ ] showed real progress in fifth grade. His test scores showed a half year's growth or more in several subjects. See pp. 12-13, *supra*. His classroom performance was even better. Ms. Friend testified that [ ] had struggled at the beginning of the year, but by the end of the year, he was reading fourth grade books, vying to answer questions in class, "felt good about himself," served "as a role model for others," had made "great gains" in math, and had satisfactory peer relationships. (I, 258-273). Ms. Hayes also testified that [ ] was functioning on a fourth grade level in his homebound instruction. (I, 408-412, 433.)

The District has candidly acknowledged that [ ] continues to test below grade level and that his test performance should not be deemed sufficient. Mr. Carnevale, the District school psychologist, offered a reasonable explanation for the divergence between his standardized test scores and his classroom performance. [ ]'s ADHD makes it difficult for him to sustain the attention required to complete standardized tests effectively, and leads to impulsivity in responding to questions. (I, 180-181; P48, D42.)

We recognize that [ ] must be viewed in the light of his disabilities, which will make learning more difficult. (*E.g.* I, 179-180). The Panel, however, believes that the District can fairly be criticized for not noting the slowness of [ ]'s progress earlier than it did and not acting more aggressively to address it. The District's willingness in the Fall of 1994 to evaluate [ ] more fully and bring its resources to bear in improving his educational program occurred, we believe in significant part because Ms. Arons' advocacy made the District focus on him. The [ ]es' frustration with his progress is understandable; indeed, Dr. Feichtl candidly acknowledged his progress should have been better. (I, 377.) Nonetheless, the record before us could not sustain a conclusion that he has not benefitted meaningfully from the educational program the District has given him.

### B.

The record also demonstrates that since the Fall of 1994, when the District agreed to a comprehensive reassessment of [ ], the District has shown a willingness and ability to focus resources and attention on [ ] in order to improve his academic progress. The District has shown that it stands ready to provide a program reasonably designed to address [ ]'s needs.

Given the level of distrust and contention among the parties, there is a remarkable degree of agreement as to what [ ] in fact needs. The District is recommending a structured program with the opportunity for substantial one-on-one instruction while at the same time creating the opportunity for social and educational interaction with peers in subject areas where [ ] can handle the work. For a reading program, the District recommends a multi-modal approach, including Orton-Gillingham methodology, that capitalizes on [ ]'s strengths, particularly including his ability to absorb and be excited by information that is meaningful to him.

Ms. Arons has advocated for more one-on-one instruction and a stronger focus on the Orton-Gillingham approach to reading. *E.g.* P102, ¶ 8. Dr. Kingsley described a program including small group or one-on-one instruction, the use of a phonics based approach, a behavior modification component and counselling. (II, 129-134.) Ms. King, the director of the Kildonan Summer Program, whose opinions the [ ] have also relied upon, described a program for [ ] she regarded as appropriate, which included Orton-Gillingham instruction, appropriate accommodations directed at [ ]'s reading disability and language arts instruction, daily one-on-one reading instruction, and a behavior modification component. (King 14-16.) On cross-examination, Ms. King testified that if the District provided [ ] with a program incorporating small group or one-on-one instruction, a phonics-based approach and the behavior modification component, she would expect [ ] to succeed. (King 32.)

The only area of significant substantive dispute we perceive in these various descriptions of a program designed for [ ]'s needs (aside from the residential/in school issue) is the extent to which the reading component should focus on the Orton-Gillingham methodology (which the [ ] and their advisors prefer) or only incorporate Orton-Gillingham methodology in a broader based approach to reading instruction (the District's view) This is a judgmental difference in educational policy that the hearing process is ill-equipped to resolve, *Rowley*, 458 U.S at 208, 102 S.Ct, at 3051-3052; *Lachman v. Illinois State Board of Education*, 852 F.2d 290, 297 (7th Cir. 1988). Significantly, the District has shown a willingness to be flexible and, at the urging of the [ ] and their advisors. include Orton-Gillingham methodology in its approach to [ ]'s reading instruction. We conclude from the testimony that, at this point, District officials and [ ]'s teachers genuinely desire to see him succeed and are prepared to focus more intensively on whatever methodologies they perceive to work for him.

The program that the District proposes for [ ] is an integrated program in a regular school setting. [ ] would be mainstreamed for science, social studies and art and lunch and would be in special education settings for reading, math and language arts. In [ ]'s regular education classrooms the District proposes to have up to 28 students, with approximately one-third being special education students, and two teachers—a regular education teacher and a special education teacher. The special education teacher would be responsible for implementing [ ]'s IEP and ensuring necessary accommodations are made. (II, 19-29;D89.)

The District proposes a TAM approach to language arts in a regular classroom setting utilizing both a regular education and a special education teacher. In addition, the District proposes one-on-one instruction in a resource room setting with a special education teacher trained in the Orton-Gillingham method, as well as one period a day of individual tutoring. He would also receive math instruction in a small group session. (II, 19-29; D89.)

The District also proposes to continue [ ]'s occupational therapy once a week for 30 minutes and to offer counselling to address any emotional or behavioral issues. The District did

not perceive [ ] as a significant behavior problem until his experience at Kildonan, but has demonstrated that it stands ready to address any behavior issues should they arise. (I, 185-190, 270-273, 413-417; II, 22.)

To assist [ ] with the transition from homebound instruction to an in-school program, the District has offered to continue individual tutoring with Ms. Hayes for whatever time necessary, (II, 28-29). Recognizing [ ]'s demonstrated difficulties in dealing with change, the District has also offered counselling to [ ] and his family to deal with these issues (D88; II, 30). Family counselling would, the Panel believes, materially assist the [ ] in their understanding of [ ]'s needs and their ability to provide him with the reenforcement necessary to promote the success of his in-school program.[11]

To comply with the least restrictive environment requirement, the District intends to educate [ ] in a regular school setting with special education provisions for his demonstrated needs. If needed, however, the District has available alternatives including an intensive learning center at Milton Middle School, and the Sussex Consortium, a special school in Lewes which offers behavior management and highly structured programs to meet individual needs (II, 23-25).

In short, the District has demonstrated that it has the ability to give [ ] a program which offers a reasonable prospect of academic achievement. In light of [ ]'s academic progress to date, the [ ] have an understandable concern that the District will implement this program effectively. District witnesses testified convincingly that they are not satisfied with [ ]'s progress, that they have recognized [ ]'s issues and are prepared to focus necessary resources and effort on him. (*E.g.*, I, 377.)

## IV.

Since we have concluded that the District has demonstrated it is able to provide a program suitable for [ ]'s needs, it is perhaps unnecessary to examine the Greenwood alternative the [ ] espouse. Nonetheless, we dilate briefly on it.

We have been offered very little information about the type or quality of program [ ] would enjoy at Greenwood. All we have had is Ms. King's recommendation and Mrs. [ ]'s impressions based on a single visit to the school (III, 65-67). That is an insufficient basis to enable us to evaluate what Greenwood has to offer.

Ordinarily, we would indulge a presumption that [ ] would be better served by a private institution. Given his experience at Kildonan, however, there is substantial doubt that [ ] would do well at Greenwood. The record is clear that [ ] had significant behavior problems at Kildonan, far beyond anything he had experienced at District schools. Those events and some from his public school experience led Greenwood's admissions coordinator to be "concerned that [[ ]] might have difficulty with Greenwood's structures and expectations." The coordinator was also "unsure whether there is a peer group here that he would feel comfortable with." Greenwood thus offered [ ] only a "trial basis" admission. (P88.) It is also clear from the record that [ ] does not tolerate change well. His prospects for successful transition into yet another school environment, far removed from parents, siblings, and friends are, at best, questionable. His parents' demonstrated unwillingness to become active participants in addressing [ ]'s misbehaviors at Kildonan, arising at

least in part from the time and distance between them and [ ] (III, 98-99), and the possibility that his "trial basis" admission would prove unsuccessful, only further undermines the prospects for a Greenwood placement to serve [ ] well.

We therefore cannot conclude on this record that Greenwood is a better alternative for [ ] than what the District has to offer. Moreover, even if we could conclude that the Greenwood program is superior for [ ] that would not carry the day. For better or for worse, *Rowley* makes clear that public education is not required "to maximize each child's potential." *Rowley,* 458 U.S. at 198, 102 S.Ct. at 3046; 458 U.S. at 201; 102 S.Ct. at 3048. *See Ahern v. Keene,* 593 F.Supp. 902, 915 (D.Del. 1984); *Newmarket v. Kirk,* 1983-84 IDELR 555:477, 485 (D.Del. 1984).

## V.

The [ ] also claim that numerous procedural violations have infected the development of [ ]'s academic program throughout his tenure in District schools. We address those issues as well.

*Rowley,* to be sure, requires Panel and judicial review of the process by which [ ]'s educational program has been developed and implemented. 458 U.S. at 205-208; 102 S.Ct. at 3050-3051. Process, however, is not an end in itself. The underlying concern is that the procedures implemented "result in individualized consideration of and instruction for each child." *Rowley,* 458 U.S. at 189, 102 S.Ct. at 3042. Thus, if the District is able to demonstrate that it has developed an appropriate educational program for [ ], as we have concluded, procedural deficiencies in the process that led to that result may fairly have less concern.

The [ ] assert that a number of procedural violations occurred prior to the 1995 Agreement. We view these as immaterial and, in any event, subsumed within the Agreement. On its face, the Agreement was intended to resolve all outstanding issues at that time, while reserving for the parties the right to contest [ ]'s placement for the Fall of 1995.

What occurred on [ ]'s return from Kildonan, however, is inexplicable. By late July or early August the District had at least constructive knowledge that [ ] was home. The District had communicated to the [ ] that on [ ]'s return from Kildonan, they would evaluate his experience there and use it to complete his IEP for the 1995-96 school year. (P83, D74; P84: D75, ¶ 2.) The District did absolutely nothing to perform this obligation. Moreover, even though District officials knew that the [ ] were concerned about the possibility of [ ]'s placement at Milton Middle School, they assigned him there and did nothing to inform the [ ] beyond a routine communication shortly before the start of school.

Since the District had identified [ ] as a child who needed a more intensive program and had invested in him the resources for a private summer school experience, we cannot understand its failure to react to his return. The excuse that relevant District officials were on vacation and changing assignments is inadequate. Too much time, effort and resources had been devoted to [ ] by that point, and his needs were too great, to permit him to fall through the cracks in this fashion.

As to the Milton Middle School placement, it may be that the District concluded in good faith, and even correctly, that

it could better educate [ ] there. District officials, however, had to know that the [ ] would be displeased with that decision, and perhaps were aware that the [ ] thought [ ] was to be continued at Lewes Middle School. That being so, it was incumbent on the District to discuss [ ]'s placement with the [ ] and at least attempt to persuade them of the wisdom of its decision.

Moreover, as of the opening day of the 1995-96 school year, the District had not completed an IEP for [ ]. While development of an IEP had begun in May[12] and June, Ms. Hanwell had communicated that the IEP would be revisited on [ ]'s return from Kildonan. (P83, D74.) The District made no effort to do so.

While the primary obligation to invoke the IEP process is on the District,[13] the [ ] passivity in the face of no communication from the District is also remarkable. Active parents vigorously pursuing their children's interests can often focus school officials' attentions on their children. That likely would have occurred had the [ ] initiated some communication with the District. They inexplicably sat back and waited.

The decision to keep [ ] out of school for the entire 1995-96 school year was, in our view, completely unjustified. While there is evidence that [ ] did not want to attend Milton Middle School, there is no competent evidence that he was school-phobic.[14] Rather, [ ]'s behavior is more likely explained by his oppositional, defiant tendencies, his resistance to change and the normal conduct of a 12-year-old testing adult authority until boundaries are firmly set. (Note, for example, Dr. Porterfield's description of [ ]'s behaving inappropriately until confronted.) Even if it had been shown that [ ] was school-phobic, the only responsible course of conduct, in our view, would have been for the [ ] to accept the District's offer of counselling and other assistance to attempt to facilitate [ ]'s transition into a proper academic environment. The [ ] simply abdicated parental responsibility and allowed their 12-year-old to decide what he was going to do; according to Mrs. [ ]: "He is refusing to go. It's not my decision. It's [ ]'s decision." (III, 86.)

The [ ] cannot credibly challenge the homebound program the District provided [ ]. Homebound instruction was plainly not an appropriate placement for [ ], and the District did not offer it as an appropriate placement. Even though the [ ]' anger at the District's not completing [ ]'s IEP prior to the start of the academic year is understandable and justified, their overriding obligation was to act in [ ]'s best interests. We simply cannot condone their acquiescing in a 12-year-old's desires. Parents who unilaterally make unjustified choices for their children cannot thereby impose responsibility on public education institutions. See *Ahern v. Keene, supra.*

The evidence suggests the [ ]' unwillingness to accept responsibility that is necessarily theirs. We note: their not seeking counselling, despite professional recommendations and the District's offer to provide it; P52 ("it is not my job to teach him"); their refusal to assist Kildonan in managing [ ]'s behavior; and Dr. Porterfield's statements about Mrs. [ ]'s placing blame on others. For [ ] to succeed, given his disabilities, the [ ] will have to extend themselves even further than they have. The District cannot be expected to educate [ ] without the [ ]' active support and assistance. We urge them to accept Ms. Arons' advice (P102) as to their need for counselling, and the District's offer in that regard.

As to the District's failure to comply with paragraph 2 of the Agreement and its obligation to prepare an IEP for [ ] for the 1995-96 school year, we note that had sound judgment prevailed among all concerned, that error, while substantial, could have been easily remedied. The District did convene a prompt IEP meeting and ultimately produced an IEP that we have found to offer [ ] a free appropriate public education for the year.

While the District's failure to complete an IEP for [ ] for the 1995-96 school year is a procedural violation of consequence, it cannot, in our judgment, override the express mandate of 14 *Del.C.* § 3124 and result in residential placement. On the other hand, it is an error of sufficient magnitude that we feel a remedy is appropriate and necessary. Given what had already occurred with [ ], it was reasonably foreseeable that [ ]'s education would be adversely affected by the District's inadequate preparation for his sixth grade experience. We fashion a compensatory education remedy as follows:

1. We direct the District make available to [ ], at District expense, one-on-one tutoring in reading, language arts, spelling and math, appropriate to his educational level, of at least ten hours per week for the remainder of Summer 1996, school vacations of a week or more duration during the 1996-97 school year, and the Summer of 1997;

2. We direct the District to make available to [ ], at District expense, an appropriately trained in-home tutor to assist [ ] with his homework for a minimum of eight hours per week during the 1996-97 school year.

As a separate matter, the Panel directs the District and DPI to pay the reasonable fees and expenses of Dr. Porterfield for his report.

## VI.

The Panel's decision is final. Any party may appeal by filing a civil action in the Family Court or United States District Court within 30 days of receipt of this decision.

---

[1]  "P" refers to Parents' exhibits; "D" refers to the District's exhibits. "T" refers to transcripts of the November 27, 1995 session; "II" and "III" refer respectively to the morning and afternoon/evening sessions on February 9, 1996. "King" refers to the transcript of Diana King's deposition.

[2]  As a general matter, scheduling was difficult due primarily to the limited availability of [ ]'s representative, Ruth Watson, and consultant/witness Marilyn Arons, both of The Parent Information Center of New Jersey. A second session was initially scheduled for January 8, 1996, but was postponed due to a blizzard. The session was rescheduled to January 19, 1996, but was again postponed at the request of [ ]'s advocate, Ruth Watson, who asserted that she had injured herself in a fall resulting from a slip on ice.

[3]  DPI petitioned to intervene as a party respondent in the hearing, arguing that seventy percent of the funds for [ ]'s residential placement would derive from the State and that therefore the State Board of Education was a real party in interest pursuant to 14 *Del.C.* § 3124. The Panel granted DPI's request for intervention.

[4]  Ms. Watson both opposed scheduling the argument session, and asserted that she could not participate until early July. The Panel had offered to schedule the argument from late May to mid-June, or to

permit Ms. Watson to participate by telephone. She was unwilling to accommodate the Panel, and the Panel therefore proceeded without her.

[5]  In an effort to expedite matters, the Panel gave the parties a summary decision by a letter dated June 20, 1996. Cf. *QVC Inc. v. Paramount*, Del. Supr., 637 A.2d 34, 36 n.1 (1993). This is the Panel's full decision.

[6]  On most of the recommendations related to in-school instruction, Mr. Carnevale also recommended that school officials provide "[ ]'s parents with consistent input so that they understand [ ]'s successes and difficulties, as well as the need for individual support at home."

[7]  The [ ] were displeased that Ms. Sexton was not at the IEP meeting. Ms. Hanwell explained that she did not believe it necessary to have Ms. Sexton at the meeting and, in any event, was under the impression that Ms. Sexton had moved from the area, There is correspondence suggesting that efforts were made to schedule a separate meeting with Ms. Sexton but Mrs. [ ] initially did not want to meet without Ms. Watson and/or Ms. Arons, and then did not seek to schedule a meeting (P55, D46, D52).

[8]  The [ ] contend that "fraudulent information was presented on who participated in the development of the IEP." Petitioners' Post-Trial Brief, p. 5. Page 2 of the ICT application could be read to indicate that Mr. Carnevale, Ms. Arons and the [ ] attended IEP meetings previous to the May 31, 1995 meeting.

[9]  This statement was inaccurate. Kildonan did not terminate [ ]'s enrollment; the record is clear that his parents voluntarily withdrew him, with Ms. King's concurrence. Moreover, the statement that [ ]'s "needs were too severe and extensive for its program" is inconsistent with the description of his progress in Ms. King's July 26, 1995 letter and her testimony. Since Ms. Arons was shown as a copy recipient on the foregoing letter and Mrs. [ ] had told Ms. Arons the circumstances surrounding [ ]'s withdrawal from Kildonan (II, 51, 98-99; III, 117, 121), Ms. Arons had reason to know her statement to Ms. Crowell was incorrect at the time she made it. When questioned, Ms. Arons did not effectively explain her choice of words; she asserted, however, an entitlement to present information selectively if she felt it was "relevant for [ ]." (III, 117-127.)

[10]  The [ ], through Ms. Watson, expressed "full agreement" with that request. See Memo dated February 21, 1996 from Ruth Watson to Barbara Crowell.

[11]  As long ago as the A.I. duPont evaluation of [ ] in 1991, counselling has been recommended to assist the [ ] ability to help their son's academic and social progress. The District has offered such counselling. The [ ] have not availed themselves of that offer and have offered no persuasive reason for not doing so (III, 62). Their consultant, Ms. Arons, agrees that the [ ] need "intensive parent training ... to help at home." (P102, ¶ 30.)

[12]  It was developed without input from the [ ], because they voluntarily absented themselves from the May 31, 1995 meeting of which they were notified.

[13]  Although Ms. Hanwell requested that the [ ] communicate with Dr. Feichtl on [ ]'s return from Kildonan (P83, D74), we believe the District was required to commence the IEP review once it knew [ ] has come home.

[14]  Dr. Kingsley's letter (P91, D79), rendered without examination or testing of [ ], provides no credible support for the "school-phobic" assertion. While Dr. Porterfield found [ ] somewhat depressed, there

is no support in his report for a conclusion that [ ] is psychologically unable to attend school.

---

**Minnesota**                                  **August 10, 1996**

No. 55-2103-10572-3

## Independent Sch. Dist. No. 318

Counsel for Parents: Sonja D. Kerr, Esq., Greta Mack, Esq., Melanie Neumann, Inver Grove Heights, MN.

Counsel for District: Susan Torgerson, Esq., Tim Palmatier, Esq., Knutson, Flynn, Deans & Olsen, St. Paul, MN.

Administrative Law Judge: Sara D. Jay.

### Summary

A five-year-old student with autism attended a district preschool program for three-year-olds during the 1994-95 and 1995-96 school years for approximately 7.5 hours a week. The student was placed in a small class, and received speech/language therapy and occupational therapy within the classroom. Concurrently, the student participated in a parentally arranged, home Lovaas program providing 35 hours a week of applied behavioral analysis therapy, using the discrete trial training method of instruction. The student's 1994-95 IEP provided for the incorporation of certain aspects of the student's home program into the classroom. The parents arranged for a special training session for district personnel conducted by an expert on autism. This IEP included three goals established by the district and, at the parents' request, a list of the 16 goals determined by a private autism project was attached. The parties agreed to teach the student sign-language as his primary method of communication, due to his difficulties with verbal and receptive language. In October of 1995, a new IEP for the student was developed. The student remained in the district three-year-old program by mutual agreement. The 1995-96 IEP included four goals which were substantially similar to the student's 1994-95 goals. Late in 1995, the parents, on the advice of their autism expert, began using the picture exchange communication system (PECS) with the student at home. Although the district was aware of this change in communication method, it continued using sign language with the student until April of 1996, when the district began to use PECS. While attempting to formulate an IEP for the 1996-97 school year, it was agreed by the parties that the student would be placed in a regular kindergarten class with a full-time aide. The parents requested the district train staff members who worked with the student in the Lovaas therapy method and incorporate Lovaas therapy into the student's program. When the district refused this request, the parents requested a due process hearing, challenging the district's refusal to include Lovaas therapy in the student's program and seeking reimbursement for the costs of the student's home Lovaas therapy program.

*HELD:* for the parents.

Ms. Mazman stated that Mental Health asked San Ramon (the nearest school district to CSDF) to hold IEP meetings for STUDENT because CSDF refused to do so. Ms. Mazman also testified that STUDENT's placement in the foster home was an AB3632 placement by Mental Health and that it was not a placement by a county or other agency. Ms. Mazman stated that STUDENT is still a resident of North Fork and that she, Ms. Mazman, never considered San Ramon the responsible LEA because STUDENT's mother was still her legal guardian. Ms. Mazman said that she, as the Mental Health representative, was acting under STUDENT's IEP as an educational agency throughout the period in question.

Minarets submitted no evidence showing that STUDENT was ever officially placed at Napa on a permanent basis, such that she lost her North Fork residency and assumed residency at that state hospital. Sierra submitted evidence showing that STUDENT was at the hospital for an evaluative stay which was extended simply because of the difficulty in finding her a place to stay while attending school. (Testimony of Ms. Mazman.) Even assuming arguendo that STUDENT was officially placed in Napa, Minarets submitted no evidence showing that STUDENT's placement in the foster home was by a court, regional center, or a public agency not acting as an educational agency. Sierra submitted evidence showing that STUDENT's placement was by Mental Health, acting upon her IEP, as part of her educational placement at CSDF. (Testimony of Ms. Mazman; S.R. Exh. 4, at p. 2.[4]) Ms. Mazman, as STUDENT's program manager for her education, testified that Mental Health was acting as an educational agency under STUDENT's IEP at all times, including the arrangement for the foster home. Based on the evidence submitted, the Hearing Officer finds that Minarets failed to establish either proposition described above, much less both propositions. Therefore, the Hearing Officer concludes that STUDENT's stay at Napa and the foster home placement did not shift the responsibility for STUDENT's education to San Ramon.

### Conclusion

Based on the evidence and argument presented, the Hearing Officer finds that the Master Service Agreement, Sierra's actions following that agreement, and the circumstances surrounding the certification of STUDENT's half-sister as a foster home operator do not shift the educational responsibility from Minarets to either Sierra or San Ramon. Therefore, the Hearing Officer concludes that Minarets, as STUDENT's district of residence, is the LEA responsible for providing a free appropriate public education for STUDENT for the 1997-98 school year.

### Order

1. Minarets shall assume the responsibilities of the local educational agency in providing STUDENT's education for the 1997-98 school year, consistent with federal and state laws regarding special education.

2. Sierra and San Ramon are dismissed as parties.

3. The remainder of this case shall be entitled *"STU-DENT v. Minarets Joint Union High School District and the California School for the Deaf, Fremont"* and shall be known by case number "SN 1220-97."

4. All of the parties' other claims for relief are denied.

### Prevailing Party on Each Issue

Pursuant to California Education Code § 56507(d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided. The following findings are made in accordance with this requirement:

I. Which local educational agency (LEA) is responsible for providing STUDENT with a free appropriate public education for the 1997-98 school year—Minarets, Sierra, or San Ramon?

Sierra and San Ramon prevailed on this issue to the extent that they established that they are not responsible for providing STUDENT's education and were dismissed from this matter. STUDENT prevailed on this issue to the extent that she received what she requested in this phase of her case—a ruling indicating which LEA is responsible for her education.

---

[1]   Amendments to the IDEA were signed into law on June 4, 1997.

[2]   "Sierra Exh." refers to Sierra's exhibit number 1, admitted into evidence.

[3]   "Min. Exh." refers to Minarets' exhibits, lettered A through E, and G through Q, admitted into evidence.

[4]   "S.R. Exh." refers to San Ramon's exhibits, numbered 1 through 14, admitted into evidence.

---

**Delaware**                                        **February 24, 1998**

No. DP 97-12

### In Re: Student with a Disability

Bodnar, Cropper and Modi, Appeals Panel Officers.

### Summary

A school district proposed placing a 7-year-old with a learning disability, ADHD and a history of behavior problems in a self-contained classroom at a district elementary school for the first grade. The parents objected to the proposed placement and unilaterally placed the student in a private school. The parents requested a due process hearing, challenging the proposed IEP and seeking reimbursement for the costs of the private school. The parents further alleged the district denied the student a FAPE when it failed to provide him with an aide during a previous school year and failed to furnish appropriate transportation services.

*HELD:* for the parents, in part.

The due process hearing panel concluded the parents failed to demonstrate the student required an aide in order to receive a FAPE during his kindergarten year. The student made progress that year, and there was no evidence an aide was

necessary for academic reasons. In examining the allegation that the district did not furnish the student with appropriate transportation, the panel found the student was provided transportation, and there was no evidence the student suffered any harm because of the transportation services provided. Therefore, no denial of a FAPE occurred with respect to transportation. Turning to the proposed IEP, the panel determined the district committed various procedural errors which resulted in the denial of a FAPE. The student's IEP was not revised after he was reevaluated, an untimely IEP was used to design the first grade IEP, and the results of the reevaluation were not considered when designing the first grade IEP. As a result of these errors, the placement decision was based on inaccurate information. The district was ordered to reimburse the parents for the costs of the private school as a remedy.

---

### Opinion

The [ ] commenced this due process hearing after the decision of the [ ] School District's Identification, Placement, Review and Dismissal ("IRPD") committee was issued. That decision recommended that the [ ]s' son attend a self-contained classroom in the first grade at the Forest Oak Elementary School ("FOES") for the 1997-98 school year.

The [ ]s' main challenge has been to the manner in which their claims regarding their son's IEP have been handled procedurally. For the reasons which follow we agree that the [ ]s were not offered a free and appropriate public education for the school year 1997-1998.

### Background

Petitioners' son, who is now seven years old, lives at home with his parents and his sister. He attended a home day care prior to entering the Elsmere Presbyterian Day Care in April, 1993. Due to behavioral difficulties, [ ]'s parents were asked to remove him from the day care center. [ ] has been described as being distractible, having a short attention span and acting impulsively. He also has a history of being non-compliant, resistive and easily frustrated. RC 40 at 1.[1]

[ ] was evaluated at A.I. duPont Institute in August, 1994. At that time, [ ] was identified as having Attention Deficit Hyperactivity Disorder ("ADHD") and Oppositional Defiant Disorder ("ODD").[2] He then began taking Ritalin and Clonidine for ADHD. RC 40 at 1.

In January, 1995, [ ] was evaluated by the Delaware Early Childhood Center's Early Choices program. [ ] was exhibiting delays in the following areas: personal-social development, adaptive, fine motor and cognitive skills as well as receptive and expressive language. [ ] then began receiving special educational services, occupational therapy and psychological consultation from Early Choices. In March, 1995, [ ] entered Wilmington Junior Academy ("WJA"). RC 40 at 1.

In May, 1995, a re-assessment by Early Choices determined that he continued to need special education and related services. An IRPD committee meeting was held with the [ ]s to discuss [ ]'s needs. The Early Choices staff recommended an integrated preschool at Heritage Elementary. The [ ]s felt that the Richardson Park Learning Center ("RPLC") would

more adequately meet his educational and therapeutic needs. [ ] then entered a half-day special education preschool class for four-year-olds in the fall of 1995. RC 40 at 1.

In January, 1996, a psychological reevaluation was performed at A.I. duPont Institute. Progress was noted, with continued concerns including isolation from peers, tactile defensiveness, emotional lability and impulsive behaviors. Improvement was noted in [ ]'s ability, to attend and focus with medication. The diagnostic impressions were listed as follows:

(1) Mixed receptive-expressive language disorder (mild to moderate);

(2) Disruptive behavior disorder, NOS; and

(3) ADHD (combined type).

RC 25 at 4.

In his assessment conducted on January 13, 1996 [ ] received scores of Verbal IQ: 79, Performance IQ: 110 on the Wechsler Preschool and Primary Scales of Intelligence ("WPPSI-R"). RC 40 at 3.

An occupational therapy reevaluation by the [ ] School District was conducted on January 19, 1996. At that time, areas of need were identified as follows:

(1) Acceptance of movement;

(2) Interpretation of movement information;

(3) Acceptance of tactile information;

(4) Kinesthesia (body awareness);

(5) Postural stability;

(6) Upper extremity stability;

(7) Fine-motor control; and

(8) Visual-motor skills.

Continued occupational therapy was recommended. The results of the occupational testing suggested that "[ ] appears to be a smart young man who appears to have strong perceptual and cognitive skills. . . ." RC 32 at 6.

In September, 1996, [ ] was included in a half-day special education kindergarten and attended a half-day kindergarten at WJA. About early October, [ ] had more difficulty managing anger while at WJA and started running out of the classroom and then out of the school building when upset. Because the classroom teacher did not have a paraprofessional, she would have to leave the class to locate [ ]. When these incidents began increasing, the school indicated to the [ ]s that they felt [ ] should be in a full-day special education placement. The school also indicated that for safety reasons [ ] would have to leave their program. RC 12, 13 and 40.

At this time, the [ ]s had also been expressing concerns regarding transportation and had asked for [ ] to be escorted off the bus and into the charge of an employee of WJA. The [ ]s then requested a conference at RPLC with all staff working with [ ], the principal, and the transportation department to revise [ ]'s I.E.P. and talk about placement options. The [ ]s presented a note from Dr. Susan Stine from A.I. duPont Institute indicating that [ ] has "multiple minor developmental problems and major behavioral problems" and recommending a "very

structured all-day special education program" to meet his needs. RC 40 at 2.

The [ ]s also asked about a full-day special education kindergarten for [ ]. They indicated that they felt he needed integration with typically developing children, which was why they had enrolled him in the half-day kindergarten program at WJA. However, since [ ] was demonstrating difficulty in that setting, they were requesting that [ ] provide him a paraprofessional to maintain him there. Consideration was also given to having [ ] placed in one of the RPLC's full-day readiness class for six-year-olds in the morning and then attend his kindergarten classroom in the afternoon. This solution, however, would not meet his needs and could cause more difficulties for [ ]. WJA had given the [ ]s a deadline of November 25 to provide an aide for [ ]. Mrs. [ ] volunteered to be the aide herself until someone could be hired to start the week of December 2, 1996. RC 40 at 2.

On November 12, 1996, the School District performed a speech/language evaluation at the request of the [ ]s. The results "reflect[ed] improvement in [ ]'s ability to understand time, space and quantitative concepts and in [ ]'s expressive language skills." RC 17 at 1. The test results relating to the understanding of language fell within the average range. [ ]'s overall understanding of language and expressive language skills each fell within the low-average range. RC 17.

On November 11-13, 1996, the [ ] School District administered an occupational therapy reevaluation. RC 34. The evaluation noted that while there was progress being made in many areas, continued areas of need existed in 12 of 18 categories listed on the report. RC 34 at 5. This report noted that [ ] had "made good progress in areas of sensory and motor weakness as identified in his Jan. 1996 reevaluation." RC 34 at 5. [ ], however, continued to have a mild to significant need in several areas of sensory and motor development, some of which interfere with his ability to participate in group situations. RC 34 at 6.

On November 14, 1996, the [ ]s attended an IEP meeting to conduct an annual review, develop a new IEP, determine an appropriate placement and to discuss transportation concerns. Mr. [ ], the principal of RPLC, stated that the question of an aide had not been fully investigated. Also after considering the possibility of having [ ] attend a first-grade setting for half the day, it was determined that "[ ] is currently in the most appropriate setting because he has integration in his morning placement and his placement [in RPLC] provides the small class size, behavior management system and intensive therapies and support services he needs." RC 14 at 3. Mr. [ ] also stated that he would check on the best way to write an addendum so that [ ] would be escorted to day care by an aide. *Id.* As a result of this meeting, an IEP, RC 11, was agreed to. RC at 2.

On December 17, 1996, the [ ]s requested that [ ] receive a psychological reevaluation. Since [ ] was last tested on January 31, 1996, a re-assessment could not be started until February 1, 1997 to assure test validity. The [ ]s requested a conference following the completion of this evaluation to discuss [ ]'s needs and placement for the 1997-98 school year. RC 40 at 2.

On February 5 and 6, 1997, [ ] was evaluated by Donna Louise, M.Ed. ("Louise") Louise reported that she has known [ ] since September, 1995. [ ] often needed reminders to listen

and not interrupt others during counseling sessions, but was usually cooperative and compliant. At that time, he attempted all tasks he was given, but seemed easily annoyed and irritable, possibly because different and more challenging activities were being presented. He was argumentative throughout both testing sessions and showed a need to direct and control the test booklets and materials. Following verbal directions and providing verbal responses were difficult for him. He performed well on a timed motor activity measuring the ability to learn a matching task. [ ] demonstrated good ability to attend and concentrate for an hour in a one-to-one setting when a variety of activities were presented. RC 40 at 2-3.

The WPPSI-R results were:

(1) Verbal IQ: 90

(2) Performance IQ: 106; and

(3) Full Scale IQ: 97.

The Developmental Test of Visual-Motor Integration results were:

(1) VMI Age Equivalent Score: 5 years, 6 months;

(2) Standard Score: 91; and

(3) Percentile: 27.

The Wide Range Achievement Test-Revised ("WRAT") results were:

(1) Reading: 99, Grade Equivalent K.3

(2) Spelling: 100, Grade Equivalent K.6

(3) Arithmetic: 85, Grade Equivalent K.2

The Test of Academic Performance ("TAP") results were:

Mathematics: 79, Percentile 8, Grade Equivalent K.3

Spelling: 79, Percentile 8, Grade Equivalent K.1

The Attention Deficit Disorders Evaluation Scale (School Version) produced the following:

(1) Inattentive: 9 (Average);

(2) Impulsive: 8 (Low Average); and

(3) Hyperactive: 6 (Significant).

The Emotional and Behavior Problem Scale produced the following results:

| Empirical | | Theoretical | |
|---|---|---|---|
| Social Aggression/ Conduct Disorder | 6 | Learning | 9 |
| Social-Emotional Withdrawal Depression | 1 | Interpersonal Relations | 2 |
| Learning/ Comprehension Disorder | 7 | Inappropriate Behavior | 8 |
| Avoidance/ Unresponsiveness | 11 | Unhappiness/ Depression | 2 |

| Aggressive/Self-Destructive | 6 | Physical Symptoms/Fears | 2 |

RC 40 at 3.

Louise summarized her findings as follows:

[ ] is currently functioning within the average range on both verbal comprehension and perceptual organization skills, with a full scale IQ score of 97 on the WPPSI-R. However, there is still a significant discrepancy between verbal and nonverbal abilities. [ ]'s nonverbal cognitive skills generally cluster within the average to high average range, with one area in the superior range. Verbal abilities are significantly weaker. [ ] also demonstrates anxiety and emotional lability when verbal responses are required of him. He continues to demonstrate difficulty with language processing, following directions, understanding what is said to him, and providing verbal responses. Visual-motor integration is at weakness. [ ] had made progress in acquiring readiness skills, and this area has actually been a strength for him. However, when comparing his full scale IQ score of 97 and the Performance IQ score of 106 to the standard scores of 79 on the Test of Academic Performance, there is a significant discrepancy that continues to qualify him to receive special education services as Learning Disabled. [ ] has also become more cooperative, less resistive, and more interactive with his peers. He continues to have difficulties in social interaction, interpersonal relationships, compliance, and emotional lability.

RC 40 at 7.

Based on this analysis, Louise concluded that "[i]t would appear that [ ]'s needs can be adequately met in a self-contained classroom in his feeder pattern elementary school, with speech/language and occupational therapy, if needed." RC 40 at 2; Louise III 374-75.

On February 10, 1997, [ ] was given two tests:

(i)   Key Math Diagnostic Arithmetic Test; and

(ii)  Peabody Individual Achievement Test-Revised ("PIAT-R"). In the Key Math test, [ ] scored at least at his grade level on each subtest. On the PIAT-R, [ ]'s score was originally reported as 100 which is average. RC 2 at 2; Smoot I 4-5. However, there was a correction made to the PIAT-R score due to a mistake in how the reading comprehension score was calculated. With this adjustment, which is shown on RC 10 and R 75, [ ]'s total score was 108—slightly above average. Smoot I 4-5.

On February 25, 1997, the Multi-Disciplinary Team ("MDT"), met to discuss [ ]'s recent testing. While the MDT team noted "good improvement in [ ]'s behavior in the classroom," they concluded that because of the significant discrepancy between his achievement scores and his performance scores, that [ ] continued to qualify for special education services as a student with a learning disability. RC 1 at 2.

On March 9, 1997, J. Jordan Storlazzi, Jr., M.D. ("Storlazzi")[3] and Dr. Alexandra Wojtowicz, Ph.D. ("Wojtowicz") issued a letter stating that [ ] had been medically monitored for ADHD (DSM-IV 314.01) and his history suggests that "[ ] also presents with Development Disorder NOS (DSM-IV 312.90)." The letter also stated that [ ] shows significant delays in the following areas:

(1)   daily living skills;

(2)   socialization;

(3)   gross and fine motor; and

(4)   language pragmatics.

RC 47.

At the hearing, Storlazzi confirmed these findings. Storlazzi V 68-69. "At this point, [ ] fits into the pervasive development disorder syndrome, the PDD." Storlazzi V 69. [ ] "falls in the crack." Storlazzi V 76. "There is not a program specifically designed for him ... and it is not that he needs to be in an autistic program, so he needs a combination of both." Storlazzi V 76. The Centreville School best fits [ ]'s needs now. Storlazzi V 78. Centreville is best because [ ] needs "an intense program on a very low student-teacher ratio. . . ." Storlazzi V 78-79.[4] If [ ] were a bit more severe, he would need the autistic program. Storlazzi V 91. He says that [ ] is making progress but not as quickly as desired in some areas. Storlazzi V 100.

On April 10, 1997, the IPRD Committee met to determine a placement for [ ] for the 1997-98 school year.[5] 5 RC 3. At that meeting, Wojtowicz said that [ ] "is a very unique, atypical child because his academic skills seem okay, his IQ in the verbal areas are average, yet his non-verbal skills are low, and he has significant problems with social comprehension." RC 3 at 4.[6] At that time Smoot recommended a self-contained classroom because [ ] had done so well in the program at the RPLC. RC 3. Frey described the FOES program as providing academic services in a self-contained resource room, Walker V 17, and ten hours per week in a regular education setting in order to receive an opportunity to socialize with peers. Walker V 17. Walker doubted the recommendation and believed [ ] "needed to be in a lesser restricted setting." Walker V 29. Wojtowicz pointed out that [ ]'s academic skills were fine and that his problems were with social skills. RC 3. Wojtowicz stated that [ ] may best be served at Centreville. RC 3 at 4. The [ ]s were left with two options, either RPLC with a transition into Richardson Park Elementary or a self-contained classroom in FOES. At the conclusion of the meeting, after considering all the available information, including the parents and their expert, Walker V 10, the Committee recommended that [ ] be placed in a self-contained classroom at FOES. RC 3; Walker V 9.[7]

Thereafter, on or about May 15, 1998, the [ ]s requested that the IPRD committee meet again to discuss the decision to place [ ] at FOES. RC 66. The IPRD committee declined, indicating that it had reached its final decision and that there were procedures in place to review that decision. RC 66 at 2; Walker V 32.

On August 26, 1997, [ ] was again evaluated at A.I. duPont Institute and given a speech/language evaluation. This was done as part of the admissions process for Centreville. RC 26. [ ] was found to have borderline to mid-average receptive skills

and borderline to below average expressive skills. It was noted that [ ] had a marked degree of intra-test scatter, indicating variable attention and demonstrated impulsivity. It was recommended that [ ] receive speech/language intervention in several short intensive sessions throughout the week.

On September 29, 1997 and October 20, 21 and 27, 1997 and November 13, 1997, hearings were conducted and testimony transcribed (which fills over 900 pages) and over 110 exhibits were admitted into evidence. Thereafter the parties submitted written statements in support of their various positions.

### Decision

The [ ]s have posed several main arguments (and many lesser arguments) in their post-hearing memorandum. First, they contend that [ ] needed an aide to attend WJA during the fall of 1996 and that no aide was provided for [ ] by the School District. Second, [ ] was not provided appropriate transportation from Richardson Park to WJA. Third, they generally challenge the manner in which their claims regarding [ ]'s IEP have been handled procedurally.

As to the claim that [ ] needed an aide to attend WJA, the [ ]s have failed to show that [ ] needed a full-day kindergarten program, that [ ] did not obtain educational benefit from the half-day kindergarten Richardson Park program or what kind of aide they were seeking. If all the [ ]s were seeking was an aide to ensure that [ ] did not leave his WJA classroom and not an aide to provide one-on-one educational services, then the aide would not have been an educational aide, but rather strictly a safety issue. Moreover, [ ]'s IEP for 1996-97 did not provide for an aide or a full-day program. Further such half-day programs are the norm for kindergarten children in Delaware. *Smoot I* 11. Consideration was given to having [ ] attend a first-grade program for half the day and kindergarten for the other half-day. *Myles S. v. Montgomery County Board of Education,* 824 F.Supp. 1549, 1561 (1993) ("[A]n abbreviated school day is valid under the IDEA if appropriately decided in the child's IEP." This was rejected, as [ ] was receiving appropriate behavior management and intensive therapies in his kindergarten setting and would lose the benefits of this program if he attended first grade for a half-day. RC 14 at 3.

The [ ]s also contend that [ ] has not been transported properly since his IEP was entered into in November 1996. Specifically the [ ]s claim that [ ] was not delivered directly into the hands of a WJA representative. Without getting into the particulars, even if the [ ]s were correct regarding [ ]'s transportation, there has been no evidence that [ ] was denied educational services because of the way he was transported to WJA. Nor has it been alleged that [ ] suffered any other harm as a result of the way he was transported to WJA. Accordingly we find no remedy is appropriate with respect to this issue.

As to substantive rights, a disabled student has a right to "personalized, instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Board of Educ. v. Rowley.* 458 U.S. 176 (1982). The "primary vehicle" for delivering this personalized instruction is the IEP. *Honig v. Doe,* 484 U.S. 305, 311 (1988). The IEP "sets out the child's present educational performance, and describes the specially designed instruction and services that will enable the

child to meet those objectives." *Id.* at 311. "The Act requires that an IEP be developed for each disabled child and that it be the product of a meeting between a representative of the local school district, the child's teacher, and the child's parents or guardian." *Myles v. Montgomery County Board of Education,* 824 F.Supp. 1549, 1553 (M.D.Ala. 1993).

> A student's IEP cannot be revised without holding another IEP meeting, and it is the school district's responsibility to initiate and conduct such a meeting to review the student's IEP periodically but not less than annually. Also, under Part B, each student's placement must be determined at least annually and must be based in the student's IEP. Since each student's IEP must be based on the student's unique educational needs, it is the student's IEP that forms the basis for the placement decision. If the parents are not satisfied with the services their child is supposed to be receiving in accordance with the child's IEP, the parents can request an IEP meeting at any time.

*Letter to Anonymous,* 25 IDELR 525 (1996). *See also Letter to Anonymous,* 20 IDELR 1168 (1993) ("[T]he child's IEP must be developed before the placement decision is made."); *Letter to Akaka,* 20 IDELR 75 (1993) ("The child's IEP forms the basis for the child's placement decision. That placement must be determined at least annually . . . and must be based on the child's IEP.") "The legislative history of the Act makes it clear that there should be as many meetings a year as any one child may need." *Letter to Sheridan,* 20 IDELR 1163 (1993).

Here these substantive rules were not followed. The [ ]s requested that [ ] be reevaluated on December 17, 1996 for the purpose of revising [ ]'s IEP and his placement for the next school year. RC 40 at 2. The School District agreed and conducted testing in February 1997. RC 40 at 2-3. Thereafter there should have been an IEP meeting. Walker V 24. However, no IEP meeting was held to revise [ ]'s November 14, 1996 IEP, RC 11, apparently at the [ ]s' request. Walker V 60. Instead a meeting was held of the IPRD committee on April 10, 1997 and at that meeting a determination regarding [ ]'s placement for the 1997-98 school year was made. RC 3.

The IPRD meeting minutes for April 10, 1997 indicate that the IEP used for that meeting was the November 14, 1996 IEP. RC 3. At that time the IEP was stale. It was not based on the current testing that had just been conducted on [ ]. Indeed at that time [ ] had not even entered first grade yet. [ ] was just six years old. His needs were changing every day. There is no good reason why a placement decision was being made without revising his IEP and conducting an IEP meeting with his parents. To say that the parents asked for it to occur this way is too easy. The statute says that the responsibility for the IEP meeting is on the school, not the parents.

The essence of a free appropriate public education is based upon an IEP. Here neither the [ ]s nor the IPRD committee had an appropriate timely IEP to work with and upon which to make a placement decision as to [ ]. Nor was a revised IEP presented during this due process hearing and accordingly the [ ]s were not provided a FAPE for [ ] for the 1997-98 school year. Under these circumstances, the [ ]s cannot be blamed for

placing [ ] in the placement they thought was most appropriate and which had been recommended to them by their doctor. Accordingly, the school district is directed to reimburse the [ ]s for the cost of tuition for the regular 1997-98 school year at the Centreville School.[8]

---

[1]   References to the exhibits admitted by the School District will be styled "[ ]"; those admitted by the parents [ ]; hearing testimony will be styled "witness name, volume, page number," (for example, Smoot I 3). The volume will indicate on which hearing day the testimony was given.

[2]   The latter is characterized by often losing one's temper, arguing with adults, refusing to comply, deliberately annoying others, being touchy and easily annoyed, and becoming angry and resentful to the point that it impairs social and academic functioning. RC40 at 1.

[3]   Storlazzi is a specialist in pediatrics and has a sub-specialty in development behavior pediatrics; and worked at the Albert Einstein Institute for 18 years in developmental medicine. Storlazzi V 70. He has participated in designing special education programs for children as part of a team which would include OT, PT, a learning disability specialist, school psychologist and himself. Storlazzi V 73.

[4]   Storlazzi's recommendations were to maximize [ ]'s educational potential. Storlazzi V 88. To him a FAPE means that a "child should be in the best environment socially, emotionally and academically to bring out and maximize his ability to be a functioning adult." Storlazzi V 88.

[5]   No IEP meeting was held because immediately after the evaluation the [ ]s demanded an IPRD meeting. Walker V 60.

[6]   Wojtowicz used the Vineland test, RC 42-45, to help evaluate [ ]. Wojtowicz V 122. She felt that the school district did not take the parents' recommendations into consideration respecting [ ]'s placement. Wojtowicz V 226.
   Wojtowicz does not believe that at this point in time [ ] could be integrated into a regular classroom. Wojtowicz V 136. There are not many children like him and it is a difficult and challenging problem to create an appropriate program for him. Wojtowicz V 138. She did not observe [ ] at the RPLC. Wojtowicz V 141.
   [ ]'s placement did not make sense to her, noting that him academic skills were grade level. Wojtowicz V 161-62. She was never contacted after the IPRD meeting to consult with the school district. Wojtowicz V 166.

[7]   Walker also testified that the changes to RC 10 in fact make [ ]'s scores higher. Walker V 60. Based on the higher scores, the IPRD committee probably would have recommended a less restrictive setting for [ ] than the FOES program. Walker V 61.
   Thereafter the [ ]s requested that additional goals be added to [ ]'s IEP. Of these, it was suggested that two goals be added—focusing on relating experiences and retelling stories. RC 22. The paperwork to memorialize these goal changes was never returned by the [ ]s. RC 23.

[8]   The panel also does not understand why the [ ]s' request to discuss the IPRD decision of April 10, 1997 was refused so summarily. The parents' need for an additional meeting was palpable and seemed understandable in light of the information they had received regarding FOES. This also taints the district's conduct respecting the development of [ ]'s placement.

---

**Massachusetts**                                    **April 2, 1998**

No. 98-3387

### Bellingham Pub. Schs./Tri-County Regional Vocational Tech

Counsel for Parents: Constance Hilton.

Counsel for District: Regina Tate.

Counsel for Vocational Tech: Mary Jo Reedy.

Hearing Officer: Sandra Sherwood.

#### Summary

A 15-year-old student with an unspecified disability was allowed to attend school in a vocational school district pursuant to an agreement between the vocational district and the student's district of residence. During the school year, the student's condition deteriorated to the point where both districts agreed she required a residential placement. Despite agreeing a residential placement was necessary, the districts disputed which one was responsible for funding the placement. The Massachusetts Department of Education informed the parties that the resident district was responsible for funding the placement. When the resident district refused to provide the student with a placement, the parents requested a due process hearing, seeking an emergency placement. According to the parents, the student was at risk for "self-injurious" behavior if she was not placed in a residential program. The resident district filed a motion to dismiss the parents' motion for an emergency placement.
   *HELD:* for the parents.
   The hearing officer rejected the resident district's motion to dismiss, finding he was authorized to order an emergency placement pending resolution of the funding dispute. The hearing officer further noted that a hearing was not necessary before determining the interim placement for the student, stating the parties agreed the student required a residential placement and that the resident district did not want a hearing. In examining which district was required to fund the interim placement, the hearing officer looked to the Massachusetts DOE's previous determination that the resident district was obligated to fund the placement. There was little statutory authority on point, and the DOE's decision was entitled to deference. Therefore, the hearing officer ordered the resident district to fund a residential placement for the student pending resolution of the underlying funding dispute.

---

#### Amended Ruling on Parents' Motion for an Emergency Placement, and on Bellingham Public Schools' Motion to Dismiss

The Student is a 15-year-old student who resides with her parents in Bellingham, MA. In September, 1997, she entered the Tri-County Regional Vocational School District (hereafter, Tri-County) in Franklin, MA. Such was funded by Bellingham Public Schools (hereafter, Bellingham) pursuant to a contract tuitioning in a non-resident student. The Student had emotional difficulties during the fall, precipitating evaluations and a